# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
December 15, 2009 Session

## STATE OF TENNESSEE v. WILLIAM GEORGE SOLLER, JR.

**Appeal from the Circuit Court for Sevier County**
**No. 12759-II    Jon Kerry Blackwood, Senior Judge**

---

**No. E2008-02420-CCA-R3-CD - Filed June 9, 2010**

---

The defendant, William George Soller, Jr., appeals from his Sevier County Circuit Court jury convictions of felony reckless endangerment, reckless aggravated assault, fourth offense driving under the influence ("DUI"), and leaving the scene of an accident. In this appeal, the defendant contends that: (1) the trial court erred by refusing his request for a change of venue; (2) the trial court erred by refusing to excuse a potential juror for cause; (3) the trial court erred by refusing to permit the testimony of an expert witness for the defense; (4) the evidence was insufficient to support his convictions for felony reckless endangerment and DUI; (5) the trial court erred in its instructions to the jury; (6) the trial court should have dismissed one count of the indictment as duplicitous; and (7) the trial court erred by classifying the defendant as a Range II, multiple offender for sentencing purposes. After a review of the record, we affirm the defendant's convictions but vacate the defendant's sentences on the felony convictions of reckless aggravated assault and fourth offense DUI and remand the case to the trial court for resentencing.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed in Part; Vacated in Part; Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Tracy Jackson Smith, Assistant Public Defender (on appeal); and Ralph E. Harwell, Knoxville, Tennessee (at trial), for the appellant, William George Soller, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; James B. Dunn, District Attorney General; and Steven R. Hawkins, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

The convictions in this case are the result of a collision between the defendant's Cadillac Escalade and a motorcycle driven by the victim, Steve Helton, at the intersection of the Parkway and Collier Drive in Sevierville on August 29, 2007. The defendant fled the scene but was arrested at his home a short time later.

At trial, Gregory Lane Estes testified that at the time of the accident he delivered bread to grocery stores for Flower's Bakery Bread Company. During the early morning hours of August 29, 2007, Mr. Estes had completed a delivery at the Kroger on Wears Valley Road in Pigeon Forge and was traveling on the Parkway toward the Walmart in Sevierville. As he waited at the traffic light at the intersection of the Parkway and Collier Drive to make a left turn into the Walmart, he heard "a motorcycle coming from behind" him and saw a large, black sport utility vehicle ("SUV") pull up to the light at Collier Drive. He recalled that despite having a red light, the black SUV "turned right and went straight through the light" without stopping. At the same time the SUV ran the light, Mr. Estes looked back and saw the motorcycle approaching the intersection. According to Mr. Estes, the SUV changed from the far right lane of travel into the middle lane at the same time that the motorcycle "switched lanes from the far lane into the center lane" trying to avoid the SUV. Then, "[t]he motorcycle made contact with the SUV . . . on the driver's side between the front and back tire." Mr. Estes described the collision as "hard enough to knock the motorcycle into a thousand pieces and to launch the operator of the motorcycle over into oncoming traffic" where the rider of the motorcycle "landed in the second to last lane of oncoming traffic face-down headed toward Governor's Crossing." He said the SUV "rolled for about ten feet and then took off" at a high rate of speed. At that point, Mr. Estes called 9-1-1 and went to assist the rider of the motorcycle.

Mr. Estes described the condition of the motorcycle rider, "He was in bad shape. There was a couple of rivers of blood coming out of his head. You couldn't tell where because he was really messed up." Mr. Estes said he could not see inside the SUV and thus could not tell if a man or woman was driving or if there was more than one occupant. Mr. Estes told authorities that the believed the SUV to be a black Cadillac Escalade. Mr. Estes testified that the motorcycle could not have avoided the collision because "it happened so quickly . . . and . . . the guy made no signal to change lanes."

During cross-examination, Mr. Estes estimated that the motorcycle was traveling at 40 to 45 miles per hour as it approached the intersection of the Parkway and Collier Drive. As for the other vehicle he said, "The Escalade, as he made his turn and came and drifted into the next lane, he might have been doing tops ten miles an hour." Mr. Estes agreed that the motorcycle "gained upon this vehicle very, very quickly."

-2-

On redirect-examination, Mr. Estes testified that had the Cadillac Escalade remained in the far right lane without changing lanes the motorcycle could have avoided the accident.

Robert Clinton testified that on August 29, 2007, after getting off work at his job as a desk clerk, he went to The Roaming Gnome Pub in the Governor's Crossing shopping center to visit with friends. He stated that although the restaurant served alcohol, he did not drink any. Mr. Clinton left the pub and went to the Walmart located just across the Parkway to purchase groceries. After purchasing his groceries, he got into his vehicle to travel back across the Parkway to the pub. As he sat stopped at the red light at the intersection of the Parkway and Collier Drive just after midnight, he saw a "motorcycle go airborne across the median into the oncoming traffic." He said that the motorcycle had been traveling from Pigeon Forge toward Sevierville and that the motorcycle had the green light at the time. Mr. Clinton recalled seeing a large, black SUV approach the intersection directly across from him and then seeing the SUV drive away from scene of the accident "quickly." He stated that he did not see the actual collision.

Sevierville Police Department officer and accident reconstructionist Preston Parrish testified that he was called to the scene of the accident involving a motorcycle being ridden by the victim, Steve Helton, to perform an accident investigation. He stated that as part of his effort to reconstruct the collision, he determined that the distance from the beginning of the skid marks made by the motorcycle to the point of impact was 24 feet. His measurements led him to conclude that the motorcycle had been traveling 45 miles per hour when the rider began the sudden deceleration. He stated that there were no skid marks from the other vehicle, indicating that there had been no sudden deceleration. He said, "The Cadillac Escalade entered the intersection making a right-hand turn improperly . . . . trying to attempt to enter the middle or fast lane." Officer Parrish testified that the collision took place "in the middle lane, closer to the fast lane" and that the impact of the collision caused the motorcycle to travel from the center lane of the north-bound Parkway into the far right lane of the south-bound Parkway. He said that the distance from the center of the intersection to the point of impact was 64 feet.

Officer Parrish testified that he found the side mirror from the Escalade as well as part of the vehicle's running board lying in the roadway. Officer Parrish testified that the victim could not have avoided the crash even if he had been traveling at the posted speed limit of 35 miles per hour because "the total distance for the crash was [123.74] feet, and if he had been doing thirty-five miles an hour, he would have needed a total distance of [128.28] feet to come to a complete stop." Based on his investigation, Officer Parrish concluded that the proximate cause of the accident was "the improper turn and the failure to yield to the right of way for the motorcycle."

During cross-examination, Officer Parrish testified that the motorcycle was going 38 miles per hour when it collided with the Escalade. He acknowledged that he learned that the victim had been drinking prior to the accident, and he stated that he compensated for the victim's intoxication by changing his "perception and reaction time from 1.2 to 1.5." Officer Parrish testified that he considered the victim's excessive speed and intoxication in reaching his conclusion that the accident was caused by the Escalade's improper turn.

Sevierville physician Doctor Eric Littleton, the victim's personal physician, testified that in addition to their relationship as doctor and patient, he and the victim knew each other through their involvement with the Sevier County High School football team. Doctor Littleton explained that he did not treat the victim during the victim's hospitalization after the accident but that he had reviewed the victim's medical records from that hospitalization and had supervised the victim's aftercare. Doctor Littleton testified that as a result of the collision in this case, the victim suffered a severe closed-head injury that included a contusion to the brain and fractures to the occipital bone and temporal bone. The victim also suffered a fracture to his nose that was so severe that it required plastic surgery. Doctor Littleton explained that because of the swelling of his brain, the victim remained comatose for several weeks following the accident "partially induced by the medicine he was given." The victim developed sepsis, a blood infection, which threatened his life, but he recovered and was moved from the University of Tennessee Medical Center to the Patricia Neal Rehabilitation Center on October 15, 2007. Doctor Littleton testified that the victim was released from the rehabilitation center on November 2, 2007, and he described the victim's recovery as "nothing short of miraculous."

During cross-examination, Doctor Littleton testified that after the consumption of alcohol, intoxication will reach a peak and then decrease as the alcohol is metabolized and eliminated from the body. He stated that the rate of elimination can be affected when a person is given other medications that are also cleared by the liver. Doctor Littleton confirmed that doctors did not test the victim's blood alcohol concentration ("BAC") for several hours, noting that determination of the victim's BAC was not the focus at that time because "[t]hey were trying to save his life. The focus [was] the basics, airway, breathing, circulation." Doctor Littleton also acknowledged that the victim was very agitated at the scene, but he insisted that the victim's alcohol level "makes no bearing on the fact that if that person is agitated, you're going to give them medicines to make sure they are not agitated."

The victim, Steve Helton, testified that he was employed as a lieutenant with the Pigeon Forge Police Department. He stated that he had previously ridden with the department's motorcycle unit and that he became one of the motorcycle instructors for the department in 1987. The victim testified that he had no recollection of the collision due to

-4-

the injuries he received. He stated that his last memory before the crash was of events that occurred two days prior to the accident and that his first memory after the accident was of being moved from the hospital to the rehabilitation center. The victim testified that as a result of the accident, his pectoral muscle was torn and his "right foot . . . turns out more than just a straight normal." He stated that at the time of trial, he continued to suffer from pain in his foot and shoulder.

During cross-examination, the victim testified that he had not seen his helmet since the accident. He described the helmet he was wearing at the time of the accident as "a half or skull styled helmet" and stated that it was the same style that the motorcycle officers wear. To his recollection, the motorcycle was in proper working order.

Mark Roberts, who worked at Bluegreen Corporation, "a time-share sales resort" where the defendant was his boss, testified that following work on August 28, 2007, he and the defendant went to The Roaming Gnome Pub. Mr. Roberts stated that the defendant drove his black Cadillac Escalade from their workplace to the restaurant. Mr. Roberts testified that he saw the defendant drinking a beer at one point but did not know how many beers the defendant consumed. Mr. Roberts admitted that he had previously told investigators that the defendant had had "six or less" beers that evening. Mr. Roberts said that the defendant was still at the pub when Mr. Roberts left sometime between 9:00 and 9:30 p.m.

Ashley Stewart, a server at The Roaming Gnome Pub, testified that the defendant came into the pub shortly after 5:00 p.m. on August 28, 2007, and that he left "right around last call, probably 11:30, twelve o'clock." She estimated that the defendant drank five 22-ounce beers because there were seven on his tab but he purchased some for other people.

During cross-examination, Ms. Stewart said that she did not see the defendant exhibit outward signs that he was overly intoxicated.

John Moore testified that he went to The Roaming Gnome Pub at approximately 10:30 p.m. on August 28, 2007, and that he saw the defendant playing pool. Mr. Moore recalled that after he left around midnight, he spoke briefly to the defendant in the parking lot. Mr. Moore stated that the defendant was driving a black Cadillac Escalade and that no one else was in the vehicle. He recalled that the defendant exited the parking lot by driving through the Books-A-Million parking lot. Mr. Moore "left in the opposite direction on Collier Drive."

Mr. Moore acknowledged that the defendant traveled "somewhat" in the

direction of his place of work.

Pigeon Forge Police Officer Brett Maggard testified that he was on patrol on August 29, 2007, when he received a "BOLO"[1] for a truck-style Cadillac Escalade that had been involved in a hit and run accident in Sevierville. Officer Maggard stated that he was familiar with a vehicle fitting that description and that the vehicle belonged to the defendant, who lived on Teaster Lane. He testified that he and other officers went to the defendant's address at 12:37 a.m. on August 29. Officer Maggard stated that he observed "extensive damage" to the defendant's black Cadillac Escalade, which was parked in the driveway. He added that there was "blood on the side of" the Escalade. Officer Maggard testified that he knocked on the door, and the defendant answered wearing day clothes. He said that he saw the defendant's wife, who was wearing a t-shirt and underwear, walking up the stairs. At that point, the defendant told Officer Maggard that "his wife had picked him up from work."

During cross-examination, Officer Maggard testified that the defendant was detained immediately. He acknowledged that the defendant drank tea out of a plastic bottle while officers were present.

Pigeon Forge Police Corporal Matt Pendleton testified that immediately upon hearing the BOLO, he knew the suspect vehicle belonged to the defendant because he had encountered the defendant in the vehicle "[a]t least twice." Corporal Pendleton arrived at the defendant's residence at 12:40 a.m. and saw the defendant's black Cadillac Escalade in the driveway with damage to the driver's side and fresh blood spatter on the left front. He stated that the hood of the vehicle was still warm.

Corporal Pendleton stated that he observed the defendant's wife "roaming the house and . . . called for her two to three times to come on down, that [the officers] needed to speak with her, and she didn't, so [we] . . . detained her also." He recalled that when he told the defendant's wife that the defendant had said she picked him up from work that evening, she said, "He said what?" Corporal Pendleton stated that he advised both the defendant and his wife of their *Miranda* rights and that the defendant told his wife not to say anything to the officers.

Corporal Pendleton testified that he kept the defendant and his wife detained until officers from the Sevierville Police Department arrived. During that time, the defendant's wife was allowed to call the defendant's parents and to go upstairs and check on their four-year-old son, who was sleeping. Corporal Pendleton recalled that the defendant drank a Lipton green tea in a plastic bottle, used the restroom, and smoked cigarettes while

---

[1] Be on the lookout.

they waited. Corporal Pendleton testified that he smelled and examined the green tea before allowing the defendant to drink it and that there was no alcohol in the drink. During the nearly three hours he was in the defendant's home, Corporal Pendleton noticed that the defendant's "speech was slow. He had red glassy eyes. He smelled of an alcoholic beverage." He described the defendant as "very intoxicated."

Sevierville Police Department Detective Ray Brown testified that he was working as a patrolman in 2007 when he responded to the accident at the intersection of Collier Drive and "U.S. 441 Parkway." He stated that after collecting debris from the scene, he went to the defendant's residence, seized the defendant's vehicle, and took photos of it. He recalled that the driver's side door of the Escalade would not open because of the damage and that officers eventually pried the door open with their hands. Inside the vehicle, he found a book of matches from The Roaming Gnome Pub and Eatery. Detective Brown also "[m]easured the seat and the distance from the steering wheel and the pedals." He stated that he sat in the vehicle himself and "could touch the pedals but it wouldn't be comfortable." Detective Brown testified that the defendant was taller than he and that the defendant's wife was shorter than he.

Detective Brown testified that a check of the defendant's license established that it had been revoked. While at the defendant's residence, Detective Brown observed that the defendant's speech was slurred, "[h]is eyes were glassy and as he came down the steps he was a little wobbly." He recalled that the defendant refused a blood alcohol test, but Detective Brown believed him to be intoxicated.

During cross-examination, Detective Brown acknowledged that the defendant had been issued a restricted license, but he explained that the restricted license is not valid unless accompanied by certain paperwork and an ignition interlock device. The defendant had neither the necessary paperwork nor the ignition interlock device in the Escalade.

Sevierville Police Department Detective Kevin Bush testified that he went to the defendant's residence following the accident and observed the defendant to be "under the influence of an intoxicant," specifically alcohol. He also testified that the intersection where the accident occurred was on a public road in Sevier County.

Tennessee Bureau of Investigation forensic scientist Jennifer Millsaps testified that deoxyribonucleic acid ("DNA") testing established that the blood on the Escalade belonged to the victim.

The State rested, and the defendant offered the testimony of Renee Degioanni, an employee of the Smoky Mountain Brewery in Pigeon Forge who was working behind the

-7-

bar on the night of the accident. Ms. Degioanni testified that she served the victim, who came to the restaurant on two different occasions that evening. She recalled that during his first visit to the restaurant, the victim and his six to eight companions "were eating pizza and drinking beer." She identified the victim's tab from that first visit, which established that the victim checked out at 8:14 p.m. and spent $37.73 on pizza and beer. Ms. Degioanni testified that the victim returned to the restaurant sometime between 9:30 p.m. and 10:00 p.m. with two people of the same group. She stated that the three sat at the bar and shared bread and two appetizers and that they drank beer out of 32.8-ounce mugs. She recalled that the victim drank two large beers and two smaller, 16-ounce beers. Ms. Degioanni testified that the victim paid the tab at 11:42 p.m. She said that the victim was intoxicated to a point that she would have been concerned about him riding a motorcycle.

Brandon Hollifield, also a server at the Smoky Mountain Brewery in Pigeon Forge, testified that he saw the victim the first time he came into the restaurant sometime between 5:00 and 7:00 p.m. but did not wait on him. He recalled that each person in the victim's group had a beer during that time. Mr. Hollifield stated that the victim returned to the restaurant sometime after 9:00 p.m. with two gentlemen and sat at the bar. He recalled that all three gentlemen were riding motorcycles. Mr. Hollifield testified that at one point in the evening, he asked the victim and his companions if they were "okay to ride." He stated that nothing in particular about their behavior caused him to ask the question and that he was concerned because there were "a lot of beers on the table" and people were "getting loud." Mr. Hollifield admitted telling the victim's companions that he believed the victim to be drunk and that the victim should not be allowed to ride his motorcycle.

The defense rested, and in rebuttal the State offered the testimony of Mary Driggers, a cashier at Faststop Number 12 "on the corner of Wears Valley Road in Pigeon Forge." Ms. Driggers testified that the victim came into the Faststop Number 12 on the night of the accident. She said, "He got there about ten minutes until ten and left about 11:30." She stated that she had an extended conversation with the victim and that she did not believe him to be intoxicated. She recalled that the victim drank a 20-ounce Mountain Dew while at the store.

On this evidence, the jury convicted the defendant in count one of the lesser included offense of reckless endangerment with a deadly weapon, in count two of reckless aggravated assault, in count three of DUI, and in count four of leaving the scene of an accident. The jury acquitted the defendant of count five, driving on a revoked license. The defendant waived his right to have a jury determination of whether he had accumulated the sufficient number of prior DUI convictions, and the trial court determined, based upon the certified copies of conviction judgments presented by the State, that the defendant was guilty of fourth offense DUI.

*I. Venue*

The defendant first contends that the trial court erred by denying his motion for a change of venue based upon the extensive pretrial coverage of this case. The State asserts that the defendant is not entitled to relief on this issue because he failed to "establish actual bias or prejudice." We agree with the State.

Prior to trial, the defendant moved the trial court to change the venue of the trial from Sevier County "or in the alternative, bring in a jury from another district" based upon the "extensive, repeated, erroneous, and unfavorable pretrial publicity" prior to the trial. He noted that many news stories contained "defamatory statements" about the defendant and that there had been "fund raising events to collect money to help pay the [victim's] medical bills . . . throughout the community from which a jury would be drawn." The defendant submitted the affidavit of a local attorney and numerous internet and print media articles about the accident in support of his position.

At the pretrial hearing on his motion, the defendant offered no live testimony and instead chose to rely on the affidavit and articles exhibited to his motion as proof of the extensive pretrial publicity. The State opposed the motion but offered no live testimony or proof in opposition to that offered by the defendant. The trial court observed that the case "ha[d] generated an inordinate amount of publicity" in what the court classified "as a small community." The trial court also noted a "deep concern" that "there have been numerous articles that have either reported the defendant's prior conduct and his prior record or misreported his prior record." Despite these observations, the trial court denied the motion on the basis that the defendant had failed to show that an impartial jury could not be found in Sevier County. The trial court stated that the court would "be receptive and will revisit [the issue of venue] if it appears . . . that it may be difficult to [e]nsure a fair and impartial trial."

The Tennessee constitution provides that "in all criminal prosecutions, the accused hath the right to . . . in prosecutions by indictment or presentment, a speedy public trial, by an impartial jury of the County in which the crime shall have been committed." Tenn. Const. art. 1, § 9; *see also* Tenn. R. Crim. P. 18(a) ("Except as otherwise provided by statute or by these rules, offenses shall be prosecuted in the county where the offense was committed."). Despite this general rule, "[t]he court may change venue of a criminal case on the defendant's motion . . . . The court should order a venue change when a fair trial is unlikely because of undue excitement against the defendant in the county where the offense was committed or for any other cause." Tenn. R. Crim. P. 21(a). Any motion requesting a change of venue must "be accompanied by affidavit(s) averring facts constituting the alleged undue excitement or other cause on which the motion is based." Tenn. R. Crim. P. 21(b).

In making its decision to grant or deny a motion for a change of venue, the trial court must "consider a number of factors, including the nature and extent of pre-trial publicity, the degree of publicity in the area from which the venire will be drawn, the existence of hostility or demonstrations against the defendant, and the length of time between the pre-trial publicity and the trial." *State v. Davidson*, 121 S.W.3d 600, 611 (Tenn. 2003) (citing *State v. Hoover*, 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979)).[2] Prejudice will not be presumed on the mere showing that there was considerable pretrial publicity. *Dobbert v. Florida*, 432 U.S. 282, 303 (1977); *State v. Kyger*, 787 S.W.2d 13, 19 (Tenn. Crim. App. 1989). Moreover, "[t]he mere exposure of jurors to newspaper publicity is not constitutional error," *Lackey v. State*, 578 S.W.2d 101, 103 (Tenn. Crim. App. 1978) (citing *Murphy v. Florida*, 421 U.S. 794 (1975)), given that "[o]ne who is reasonably suspected of a serious crime cannot expect to remain anonymous," *id.* (citing *Dobbert*, 432 U.S. at 303).

The decision to grant the defendant's motion for a change of venue rests soundly within the discretion of the trial court, and this court will not overturn the trial court's decision absent a "clear" abuse of that discretion. *Davidson*, 121 S.W.3d at 611-12

---

[2]The *Hoover* court lists 17 relevant factors to be considered when deciding a motion for a change of venue and posits that the factors are also relevant to appellate review of the trial court's decision:

1. Nature, extent, and timing of pretrial publicity.
2. Nature of publicity as fair or inflammatory.
3. The particular content of the publicity.
4. The degree to which the publicity complained of has permeated the area from which the venire is drawn.
5. The degree to which the publicity circulated outside the area from which the venire is drawn.
6. The time elapsed from the release of the publicity until the trial.
7. The degree of care exercised in the selection of the jury.
8. The ease or difficulty in selecting the jury.
9. The veniremen's familiarity with the publicity and its effect, if any, upon them as shown through their answers on voir dire.
10. The defendant's utilization of his p[er]emptory challenges.
11. The defendant's utilization of challenges for cause.
12. The participation by police or by prosecution in the release of publicity.
13. The severity of the offense charged.
14. The absence or presence of threats, demonstrations or other hostility against the defendant.
15. Size of the area from which the venire is drawn.
16. Affidavits, hearsay or opinion testimony of witnesses.
17. Nature of the verdict returned by the trial jury.

*Hoover*, 594 S.W.2d at 746.

(citing *State v. Dellinger*, 79 S.W.3d 458, 481 (Tenn. 2002)). "Moreover, before a conviction will be reversed for the trial court's failure to grant a change of venue, an accused must establish 'that the jurors who actually sat were biased and/or prejudiced.'" *Id.* at 612 (quoting *Dellinger*, 79 S.W.3d at 481); *see also State v. Mann*, 959 S.W.2d 503, 532 (Tenn. 1997); *State v. Melson*, 638 S.W.2d 342, 361 (Tenn. 1982).

Repeating the claims made in his pretrial motion, the defendant asserts on appeal those things the trial court found as uncontroverted, namely that Sevier County is a small community and that the case had been the subject of extensive, and sometimes unfair, pretrial publicity. Aside from asserting that members of the jury were exposed to publicity, the defendant makes no showing that any of the jurors who sat in his trial "were biased and/or prejudiced." Further, the record evinces no bias or prejudice on the part of any juror. Under these circumstances, we cannot say that the trial court abused its discretion by failing to grant the defendant's request for a change of venue.

*II. Juror Number 27*

In a related claim, the defendant contends that the trial court erred by refusing to dismiss for cause Juror Number 27, Ms. Looney, based upon the juror's position as a civilian employee of the Knoxville Police Department, her familiarity with the case, and the fact that she made financial contributions to a fund established to cover the victim's medical bills. The State asserts that the defendant waived our consideration of the issue by failing to make a contemporaneous objection to the seating of the juror. In the alternative, the State submits that the defendant has failed to establish that Ms. Looney was biased for the State or prejudiced against him. We agree with the State that the defendant has failed to establish actual juror bias or prejudice.

During voir dire, Ms. Looney stated that she was employed as an administrative support staff member for the Knoxville Police Department violent crimes unit. She also stated that her son's little league football team participated in a benefit for the victim and that she had personally contributed financially to the victim's recovery fund. Although she initially indicated that she was unsure whether her position with the Knoxville Police Department or her financial contributions would prevent her from remaining impartial, Ms. Looney eventually maintained that neither fact caused her to hold any prejudice toward the defendant. She unequivocally stated that she could decide the case based on the evidence presented by the parties and the law as given by the court.

The defendant then challenged several jurors for cause and exercised all of his peremptory challenges. Neither the State nor the defense challenged Ms. Looney or used a peremptory challenge to remove her from the jury. After the jury and two alternates had been

seated, defense counsel addressed the court and stated that he "had overlooked" the seating of Ms. Looney. He acknowledged that he had failed to challenge her for cause "and that was a mistake and I would like to." He asked the court to remove Ms. Looney and replace her with one of the two alternates. The trial court denied the request noting that Ms. Looney "said that she could put all that aside."

"A court may discharge from service a grand or petit juror . . . for any other reasonable or proper cause, to be judged by the court. That a state of mind exists on the juror's part that will prevent the juror from acting impartially shall constitute such cause." T.C.A. § 22-1-105 (1994). Accordingly, the trial court retains "wide discretion in ruling on the qualifications of a juror," *State v. Howell*, 868 S.W.2d 238, 248 (Tenn. 1993) (citing *State v. Kilburn*, 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989)), and the trial court's ruling in this regard will not be overturned absent a showing of an abuse of that discretion, *Burns v. State*, 591 S.W.2d 780, 782 (Tenn. Crim. App. 1979). "[I]rrespective of whether the trial judge should have excluded the . . . challenged jurors for cause, any error in this regard is harmless unless the jury who heard the case was not fair and impartial." *Howell*, 868 S.W.2d at 248 (citing *State v. Thompson*, 768 S.W.2d 239, 246 (Tenn. 1989)). When the defendant preserves the issue by exercising all of his peremptory challenges, "the failure to correctly exclude a juror for cause is grounds for reversal only if the defendant exhausts all of his peremptory challenges and an incompetent juror is forced upon him." *Howell*, 868 S.W.2d at 248 (citing *Ross v. Oklahoma*, 487 U.S. 81, 89 (1988); *State v. Jones*, 789 S.W.2d 545, 549 (Tenn. 1990)).

Aside from stating that "common sense dictates that [Ms. Looney]'s close association with law enforcement officers and her expressed sympathy for Mr. Helton would and did affect her judgment," the defendant offers no evidence to establish that Ms. Looney was not impartial. In the absence of any proof of juror bias or prejudice, however, we cannot say that the trial court abused its discretion by refusing to dismiss Ms. Looney for cause. Ms. Looney repeatedly stated that neither her job nor her financial contribution to the victim's recovery fund would prevent her from deciding the case on the evidence presented at trial.

*III. Expert Testimony*

The defendant next contends that the trial court committed reversible error when it ruled that he would be able to present expert testimony regarding the victim's blood alcohol level only if he agreed to a continuance to allow the State to procure its own expert review of the issue. He argues that the trial court's ruling impermissibly forced him to choose between his constitutional right to present a defense and his constitutional right to a speedy trial. The State contends that the record is inadequate for our review of this issue.

-12-

We agree with the State.[3]

During the June 13, 2008 motions hearing, the State moved to suppress the results of a BAC test administered to the victim, arguing that the results of the test were inadmissible pursuant to Tennessee Code Annotated section 55-10-406 because the test was administered more than two hours after the accident. The defendant argued that the statute was inapplicable and that suppression of the test results would violate his constitutional right to present a defense. The court reserved ruling on the motion but noted that the defendant would have to present "proof before that test comes in that that would be reliable, that it would be an accurate reflection of . . . something that would tie it in to the time of the accident." As part of its ruling, the trial court granted both parties access to the victim's medical records.

As the State correctly points out, the record does not contain a transcript of the telephone conversation between the trial court and the parties during which the trial court made its initial ruling on the admissibility of the expert testimony. At trial, during the cross-examination of Officer Parrish, the defendant attempted to elicit the results of the BAC test administered to the victim, and the State objected. During a jury-out hearing, the trial court noted its previous ruling that it would admit the results of the victim's BAC test "if it was shown that that reading was reliable." The court also related that "just last week," the defendant "found an expert" who would testify "that at zero point five he would be able to extrapolate back from that reading up to seven hours later and could hypothesize or make an opinion as to what the blood alcohol of the victim would have been seven hours earlier." The court explained,

> Now the problem with that was that that testimony was revealed to the State only two or three days before trial and they did not have an opportunity to present an expert that would . . . either affirm that expert opinion or counter that expert opinion. . . . . The State asked for a continuance to get that testimony. The [c]ourt was willing to grant the State a continuance to review that report of [the defense] expert with the understanding that there would probably be a continuance of this case. [Defense counsel] consulted with his client, and his client was placed with the alternative or placed with the decision

---

[3]The State also argues that the defendant waived our consideration of the issue because "the defendant chose not to admit the expert testimony." We cannot agree with this assertion. Indeed, this is the defendant's precise claim, to wit: that he was improperly forced to choose his right to a speedy trial over presenting the expert testimony.

that this evidence probably would come in . . . but he would have to . . . stay in jail, he wouldn't make bond, and he could not have had the trial at this time. It was the [d]efendant's position that he wanted, rather than a continuance, he wanted this trial, and so the [c]ourt ruled at that time that the expert opinions would not be admissible because the State didn't have an opportunity to have their own expert to examine this report and offer any countervailing evidence.

The court concluded that because the BAC test was administered seven hours after the accident and because of the medical interventions conducted during that time, "there is a question of its reliability." The trial court reiterated its earlier ruling that the defendant would not be permitted to offer the expert testimony and ruled that the results of the victim's BAC test were inadmissible.

Now on appeal, the defendant claims that the trial court's ruling that the defendant would be allowed to present the testimony only if the State was granted a continuance to have its own expert examine the conclusions reached by the defense expert improperly forced him to choose between his constitutional right to present a defense and his constitutional right to a speedy trial. As an offer of proof on the issue, the defendant presented the curriculum vitae of E. Howard Taylor, PhD., noting that Doctor Taylor possessed a doctorate in biochemistry. Defense counsel then made the following assertions:

I sent to that expert the medical records, which the [c]ourt made available to both sides. I reviewed them. More importantly, he reviewed them.

He said that there was nothing . . . within the medical records, there [were] no blood transfusions, there was nothing in the medical records between midnight and seven o'clock in the morning that would have affected the reliability of a test at seven o'clock in the morning being able to be related back and extrapolated back to . . . midnight. The only thing that would have affected that in the records, and I gave him the complete set, his testimony is that the blood – he did receive some IV solutions, saline, and that those would have very, very minimally have diluted the blood and would have actually made the calculations back a bit less than maybe it would have been without that dilution. But that he still believed that based upon the test that I had sent to him from the TBI, and he was familiar

-14-

with the TBI, the medical records that I sent to them, which are the medical records of Mr. Helton that we got through this [c]ourt, reviewing them and with his knowledge, and . . . based upon his credentials and his experience that he could say that this person was approximately [.155] intoxicated at . . . twelve o'clock, after he had quit drinking. . . . I would ask the [c]ourt to consider the proffer and particularly the lack of surprise by the government . . . I think this is very, very, not only material and relevant, but important evidence for the rights of my client, Mr. Soller.

No report or affidavit of the proposed expert was submitted as evidence. Indeed, the prosecutor noted that, despite a specific reciprocal discovery request, the defendant had not provided any report of the expert to the State. Thus, the only information regarding Doctor Taylor's expert opinions came from the statements of defense counsel.

Although an oral summary of the excluded evidence may comply with Tennessee Rule of Evidence 103's requirement that "the substance of the evidence and the specific evidentiary basis supporting admission" be made known to the court, *see* Tenn. R. Evid. 103 ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [i]n case the ruling is one excluding evidence, the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer . . . ."); *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 804 (Tenn. 1975), an oral summary will not always be sufficient to preserve the issue for appellate review. Indeed, our supreme court has noted that "the better practice," in the case of excluded testimony, is to present the proof in a question and answer format. *Id.* This is particularly true when the evidence is of a highly technical nature, like that often offered by expert witnesses, and when the State disputes the validity of defense counsel's narrative, as occurred in this case. Here we have only the expert's curriculum vitae and the narrative offered by defense counsel. From this evidence, this court cannot discern what, precisely, the expert's opinion would have been, the methodology used to reach that opinion, and whether the expert would have been qualified to actually offer the opinion. *See State v. Scott*, 275 S.W.3d 395, 401-05 (Tenn. 2009) (explaining procedure for determining the admissibility of expert testimony). In consequence, defense counsel's narrative summary did not satisfy the requirements of Tennessee Rule of Evidence 103.

Without a competent proffer of the expert's testimony, meaningful review of the defendant's claim is impossible. *See State v. Hall*, 958 S.W.2d 679, 691 n.10 (Tenn. 1997) ("Not only does [an offer of proof] ensure effective and meaningful appellate review, it provides the trial court with the necessary information before an evidentiary ruling is made.

-15-

Indeed, generally, if an offer of proof is not made, the issue is deemed waived and appellate review is precluded."); *see also* Tenn. R. Evid. 103. Consequently, we are unable to conclude that the trial court abused its discretion by ordering a conditional exclusion of the evidence.

*IV. Sufficiency of the Evidence*

The defendant complains that the State failed to present sufficient evidence to support his convictions of felony reckless endangerment, reckless aggravated assault, and fourth offense DUI. Specifically, he claims that the State failed to prove that he "used or displayed a deadly weapon" or that he was under the influence of an intoxicant at the time of the accident. The State asserts that this court need only address the sufficiency of the convicting evidence for the defendant's conviction of reckless aggravated assault because the defendant's conviction of felony reckless endangerment was merged into that offense. In addition, the State submits that because an automobile may be considered a deadly weapon, the evidence sufficiently established both offenses. Finally, the State contends that the evidence supported the defendant's conviction of fourth offense DUI.

Although the State contends that review of the sufficiency of the conviction evidence for felony reckless endangerment is unnecessary because of merger, merger does not extinguish the merged finding of guilt. *See State v. Addison*, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997). Indeed, "the jury verdict stands as a legitimate finding of fact and law which the trial court should preserve," *id.*, and merger does just that as it "protects against double jeopardy and preserves the validity of the jury verdicts for future avoidance of problems related to unnecessarily dismissed 'charges' or 'convictions,'" *id.* Because the jury's verdict of guilty of the offense of felony reckless endangerment remains despite the merger of that conviction into the defendant's conviction of reckless aggravated assault, we will examine the defendant's claim that the evidence was insufficient to support that conviction.

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654. Although a criminal offense may be established exclusively by circumstantial evidence, *Duchac v. State*, 505 S.W.2d 237 (Tenn. 1973); *Winters*, 137 S.W.3d at 654, before an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong

and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." *State v. Crawford*, 470 S.W.2d 610, 612 (Tenn. 1971). "In other words, '[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt.'" *State v. McAfee*, 737 S.W.2d 304, 306 (Tenn. Crim. App. 1987) (quoting *Crawford*, 470 S.W.2d at 613).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

## A. Felony Reckless Endangerment and Reckless Aggravated Assault

The defendant, originally charged in count one with vehicular assault, was convicted of the lesser included offense of felony reckless endangerment. In count two, the jury convicted the defendant of the charged offense of reckless aggravated assault.

A person commits the offense of reckless endangerment when that person "recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." T.C.A. § 39-13-103(a) (2006). When the offense is "committed with a deadly weapon," it rises from a Class A misdemeanor to a Class E felony. "A person commits aggravated assault who . . . [r]ecklessly commits an assault as defined in § 39-13-101(a)(1), and . . . [c]auses serious bodily injury to another; or . . . [u]ses or displays a deadly weapon." *Id.* § 39-13-102(a). "'Reckless' means that a person acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 39-11-106(a)(31). In this case, "'[d]eadly weapon' means . . . [a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 39-11-106(a)(5).

The defendant concedes that an automobile may be a deadly weapon "depending upon" how it is used but, citing *State v. McGouey*, 229 S.W.3d 668 (Tenn. 2007), asserts that the State failed to establish that his vehicle was a deadly weapon in this case. In *McGouey*, our supreme court explained that "when analyzing whether a particular object is a deadly weapon under subsection B [of Code section 39-11-106(a)(5)], this Court has

looked not at how the object was designed to be used, but rather at how the object was used in the particular case." *State v. McGouey*, 229 S.W.3d 668, 673 (Tenn. 2007). The high court held, "If an item is not a deadly weapon per se, it will only be considered a deadly weapon if the defendant in a particular case actually used or intended to use the item to cause death or serious bodily injury." *Id.* at 674. Following *McGouey*, this court reiterated in *State v. Dempsey Jackson* "that an accused can be convicted of aggravated assault due to the manner in which the accused operated a motor vehicle." *State v. Dempsey Jackson*, No. W2007-01629-CCA-R3-CD, slip op. at 8 (Tenn. Crim. App., Jackson, Sept. 3, 2009) (citing *State v. Tate*, 912 S.W.2d 785, 787 (Tenn. Crim. App. 1995)).

The evidence adduced at trial, taken in the light most favorable to the State, established that the defendant got behind the wheel of his vehicle while in an intoxicated state, ran a red light, and then made an improper lane change, causing the collision which resulted in serious bodily injury to the victim. These facts established that the defendant used his vehicle in a manner that caused serious bodily injury. Further, the defendant's driving his automobile while intoxicated and violating the traffic laws established a conscious disregard for the "substantial and unjustifiable risk" that he could cause an accident. Although the defendant argues that rather than using his vehicle in a deadly manner, he was "hit by a speeding motorcycle operated by an intoxicated driver," the jury heard evidence of the victim's intoxication and excess speed but nevertheless found that the defendant had used his own vehicle in a manner capable of causing death. That was its prerogative.

## B. Driving Under the Influence

The defendant claims that although the State presented evidence that he was intoxicated while at his home following the accident, the State failed to establish that either he was driving the Escalade at the time of the accident or that he drove while intoxicated. The State submits that ample evidence was presented of both the defendant's driving and his intoxication. We agree with the State.

As charged in this case,

> It is unlawful for any person to drive or to be in physical control of any automobile or other motor driven vehicle on any of the public roads and highways of the state, or on any streets or alleys, or while on the premises of any shopping center, trailer park or any apartment house complex, or any other premises that is generally frequented by the public at large, while:

> (1) Under the influence of any intoxicant, marijuana,

narcotic drug, or drug producing stimulating effects on the
central nervous system

T.C.A. § 55-10-401(a)(1).

The evidence established that the defendant went to the Roaming Gnome Pub after getting off work at approximately 5:00 p.m. on August 28, 2007, and that he drank some 100 ounces of beer while at the pub for the next several hours. Mr. Moore saw the defendant driving the Escalade away from the pub right before the accident and stated that no one else was in the vehicle with the defendant. Officers who went to the defendant's home shortly after the accident observed the defendant in a seriously intoxicated state as evidenced by his slow speech, glassy eyes, and unstable gait. From this evidence the jury was free to conclude that the defendant was indeed driving the Escalade at the time of the accident and that he was doing so in an intoxicated state.

*V. Jury Instructions*

In a related issue, the defendant contends that the trial court's instructions to the jury "contributed to the jury's misapplication of the law" and its unsupported verdicts. He admits that the instructions provided by the trial court were an accurate statement of the law, but he argues that the order of the court's instructions and its statement that "the offense of vehicular assault 'necessarily includes' the lesser offense of reckless endangerment was confusing and misleading to the jury." He also argues that the trial court erroneously failed to instruct the jury on the offense of misdemeanor reckless endangerment as a lesser included offense of vehicular assault. The State asserts that there was no error in the instructions provided by the court.

An accused's constitutional right to trial by jury, *see* U.S. Const. amend VI; Tenn. Const. art. 1, § 6, encompasses a right to a correct and complete charge of the law, *see State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990). The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *see Teel*, 793 S.W.2d at 249; *see also* Tenn. R. Crim. P. 30. When examining the propriety of jury instructions, however, a reviewing court must review the challenged instruction in the context of the entire charge rather than in isolation. *See Sandstrom v. Montana*, 442 U.S. 510, 527 (1979) (Rehnquist, J., concurring); *see also Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973) ("[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge."); *State v. Phipps*, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). A charge is prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997).

The legal accuracy of the trial court's instructions is a question of law entitled to de novo review. *See Troup v. Fischer Steel Corp.*, 236 S.W.3d 143, 149 (Tenn. 2007). The propriety of a given instruction is a mixed question of law and fact to be reviewed de novo with a presumption of correctness. *Carpenter v. State*, 126 S.W.3d 879, 892 (Tenn. 2004); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001). The ordering of the instructions, when legally accurate and fairly supported by the proof, lends itself to the discretion of the trial court.

## A. *Definition of Deadly Weapon*

The trial court instructed the jury as follows:

> The [d]efendant, William George Soller, Jr., is charged in Count 1 of the presentment with the crime of vehicular assault. The offense of vehicular assault necessarily includes a lesser included offense of reckless endangerment and assault.
>
> In the second count of the presentment, the [d]efendant, William George Soller, Jr., is charged with reckless aggravated assault. The offense of reckless aggravated assault necessarily includes the lesser offenses of reckless endangerment and assault.
>
> . . . .
>
> The law applicable to this case is stated in these instructions and it is your duty to carefully consider all of them. The order in which these instructions are given is no indication of their relative importance. You should not single out any one or more of them to the exclusion of another or others, but should consider each one in the light of and in harmony with the others.
>
> . . . .
>
> Vehicular assault. Any person who commits the offense of vehicular assault is guilty of a crime.
>
> For you to find the [d]efendant guilty of this offense, the State must have proven beyond a reasonable doubt

-20-

the existence of the following essential elements. Number one, that the [d]efendant caused serious bodily injury to the alleged victim by the operation of a motor vehicle; and, number two, that the serious bodily injury was the proximate result of the driver's intoxication; and, number three, that the [d]efendant acted recklessly.

Reckless aggravated assault. Any person who commits the offense of aggravated assault is guilty of a crime.

For you to find the [d]efendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following elements. Number one, that the [d]efendant recklessly caused bodily injury to another; and, number two, that the [d]efendant used or displayed a deadly weapon.

Reckless endangerment. Any person who commits the offense of reckless endangerment is guilty of a crime.

For you to find the [d]efendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements. Number one, that the [d]efendant engaged in conduct which placed, or might have placed, another person in imminent danger of death or serious bodily injury and that the defendant acted recklessly and that the offense was committed with a deadly weapon.

. . . .

Motor vehicle means every vehicle, . . . excluding motorized bicycles . . . . Vehicle means every device in, upon, or by which any person or property is or may be transported or drawn upon a highway [ex]cepting devices used exclusively upon stationary rails or tracks.

. . . .

Deadly weapon means a firearm or anything

-21-

manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury or anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.

These instructions are an accurate statement of the law, they fairly submit the legal issues involved, and each was supported by the proof adduced at trial. Given that the trial court explicitly defined the terms "motor vehicle" and "deadly weapon," we fail to see how the ordering of the instructions could have caused the jury to improperly conflate the terms.

## B. *Lesser Included Offense of Misdemeanor Reckless Endangerment*

The defendant also contends that the trial court erred by failing to instruct the jury on misdemeanor reckless endangerment as a lesser included offense of vehicular assault. Although his brief is not entirely clear, we infer that the claim relates to both count one, vehicular assault, a Class D felony, and count two, reckless aggravated assault, also a Class D felony. The charge of vehicular assault resulted in a conviction of felony reckless endangerment, a Class E felony, and in count two, the jury convicted the defendant, as charged, of reckless aggravated assault. Upon the defendant's request, the trial court instructed the jury on felony reckless endangerment as lesser included offenses of both counts one and two. The defendant did not request instructions on misdemeanor reckless endangerment.

Citing Tennessee Code Annotated section 40-18-110, the State asserts that the defendant has waived our consideration of the instruction issue by failing to request the instruction either orally or in writing. At the time of the defendant's trial, instructions on lesser included offenses were governed by the provisions of Tennessee Code Annotated section 40-18-110, which provided, in pertinent part, as follows:

(b) In the absence of a written request from a party specifically identifying the particular lesser included offense or offenses on which a jury instruction is sought, the trial judge may charge the jury on any lesser included offense or offenses, but no party shall be entitled to any lesser included offense charge.

(c) Notwithstanding any other provision of law to the contrary, when the defendant fails to request the instruction of a lesser included offense as required by this section, the lesser included offense instruction is waived. Absent a written request, the failure of a trial judge to instruct the jury on any lesser included

-22-

> offense may not be presented as a ground for relief either in a
> motion for a new trial or on appeal.

T.C.A. § 40-18-110(b)-(c) (2006). The terms of the statute, which has been deemed constitutional by our supreme court, *see State v. Page*, 184 S.W.3d 223, 230 (Tenn. 2006), unambiguously state that an issue regarding the failure to instruct on a lesser included offense may not be presented on appeal unless the lesser included offense instruction was requested in writing prior to the trial, *see id.* (holding that Code section 40-18-110 "subjects the right to lesser-included offense instructions to the general rule that issues concerning incomplete instructions are deemed waived in the absence of an objection or special request"). In this case, there was no such request. Our supreme court recognized, however, that, despite the defendant's failure to request a jury instruction on a lesser included offense, the appellate could consider the issue via plain error analysis. *See id.* ("Although section 40-18-110(c) precludes a defendant from raising the trial court's failure to instruct on lesser-included offense instructions not requested in writing, appellate courts are not precluded from *sua sponte* reviewing this issue under the plain error doctrine.").

Because the defendant did not comply with Code section 40-18-110, we are precluded from considering the issue unless it warrants plain error treatment. Plain error analysis, *see* Tenn. R. App. P. 13(b) (stating that an appellate court may, in its discretion, consider issues not raised by the parties), 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."), encompasses consideration of the following factors:

> "(a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached;
> (c) a substantial right of the accused must have been adversely affected;
> (d) the accused did not waive the issue for tactical reasons; and
> (e) consideration of the error is 'necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established before this court will recognize an error as plain. *Id.* at 283. "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *Page*, 184 S.W.3d at 231.

To conduct a plain error analysis, we review count one and count two separately.

## *1. Vehicular Assault*

In our analysis of whether the trial court erred by failing to instruct on misdemeanor reckless endangerment in count one, we must necessarily determine whether felony reckless endangerment and misdemeanor reckless endangerment are actually a lesser included offense of vehicular assault. If neither is a lesser included offense, the imposition of the conviction for felony reckless endangerment in count one would be *ultra vires*. *See Strader v. State*, 362 S.W.2d 224, 227 (Tenn. 1962) ("So now when one is put on trial on a single charge of felony, he is also on trial for all its lesser included offenses, as the facts may be."). For the reasons stated below, we conclude that both felony reckless endangerment and misdemeanor reckless endangerment are lesser included offenses of vehicular assault.

For some time now, *State v. Burns*, 6 S.W.3d 453 (Tenn.1999), has served to define lesser included offenses. In *Burns*, our supreme court held that an offense is a lesser-included offense if:

> (a) all of its statutory elements are included within the statutory elements of the offense charged; or
>
> (b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
>
>> (1) a different mental state indicating a lesser kind of culpability; and/or
>> (2) a less serious harm or risk of harm to the same person, property or public interest; or
>> (c) it consists of
>> (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
>> (2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
>> (3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

-24-

*Id.* at 466-67.[4]

Vehicular assault is committed by one who, "as the proximate result of the person's intoxication as set forth in § 55-10-401, recklessly causes serious bodily injury to another person by the operation of a motor vehicle." T.C.A. § 39-13-106(a). As indicated in our analysis of the sufficiency of the convicting evidence, a person commits felony reckless endangerment when that person "recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury" and does so "with a deadly weapon." *Id.* § 39-13-103.

At first blush, the lesser offense in this case may appear to be outside *Burns*'s part (a) because vehicular assault requires that serious bodily injury must result from the operation of a *motor vehicle* and felony reckless endangerment may be committed by the use of *any* deadly weapon. We reject this feature as controlling and discern that the proper question is whether one would always commit the lesser offense when he or she commits the greater, not whether the lesser may be committed in ways that are additional to the way specified in the greater. *See, e.g., Allen*, 69 S.W.3d at 188 ("In proving the greater offense the State necessarily has proven the lesser offense because all of the statutory elements of the lesser offense are included in the greater."); *State v. Townes*, 56 S.W.3d 30, 39 (Tenn. Crim. App. 2000) (stating that criminal trespass is not a lesser included offense of burglary because a "person may commit burglary by intruding with a hand, foot or merely a remotely-controlled device" whereas "[s]uch an intrusion, though burglarious, does not equate to criminal trespass").

In determining whether, in the present case, one would always commit felony reckless endangerment, and, by extension, misdemeanor reckless endangerment when he or she commits vehicular assault, we must decide whether the description of a motor vehicle in the vehicular assault statute always imports the use of a deadly weapon. In so doing, we are mindful that our analysis follows a "statutory elements approach." *Burns*, 6 S.W.3d at 464; *Townes*, 56 S.W.3d at 38. The elements of vehicular assault include "serious bodily injury to another person by the operation of a motor vehicle." T.C.A. § 39-13-106(a). As we noted earlier in this opinion, our code defines a deadly weapon as "[a]nything that in the manner of its use or intended use is capable of causing death *or serious bodily injury*." T.C.A. § 39-

[4]In 2009, the legislature amended Tennessee Code Annotated section 40-18-110 by providing that, except for specific exceptions not germane to the present case, "[a]n offense is a lesser included offense if . . . [a]ll of its statutory elements are included within the statutory elements of the offense charged ." T.C.A. § 40-18-110(f)(1) (2009 Supp.). This amendment, effective July 1, 2009, 2009 Pub. Acts, ch. 439, § 1, is not applicable to the present case in which the offenses were committed in 2007 and the jury trial was held in 2008. As such, the test in *Burns* controls.

11-106(a)(5) (emphasis added). In *McGouey*, our supreme court said, "If an item is not a deadly weapon per se, it will only be considered a deadly weapon if the defendant in a particular case actually used *or* intended to use the item to cause death *or* serious bodily injury." *McGouey*, 229 S.W.3d at 674 (emphasis added). Thus, the statute proscribing vehicular assault describes the use of a motor vehicle in a way in which it would always be, by definition, a deadly weapon. As such, the lesser offense in the present case would always be committed when the greater offense is committed, and the lesser offense of felony reckless endangerment is included in the greater via part (a) of the *Burns* test.

That determined, we have no doubt that misdemeanor reckless endangerment, which is recklessly engaging in conduct that places or may place another in imminent danger of death or serious bodily injury, is a lesser included offense of vehicular assault via part (a) of the *Burns* test. As such, the trial court erred in failing to instruct on this lesser offense despite that the offense, if committed at all, was committed via a deadly weapon. *See State v. Allen*, 69 S.W.3d 181, 188 (Tenn. 2002). ("As a general rule, evidence sufficient to warrant an instruction on the greater offense also will support an instruction on a lesser offense under part (a) of the *Burns* test."); *id.* at 189 ("We reject the proposition that no reasonable mind could accept the existence of the [lesser] offense . . . because evidence of the use of a deadly weapon was uncontroverted."). The issue then is whether the error is harmless beyond a reasonable doubt, *see id.* at 189, and that determination, in turn, facilitates the analysis of plain error.

"When a lesser-included offense instruction is improperly omitted, we conclude that the harmless error inquiry is the same as for other constitutional errors: whether it appears beyond a reasonable doubt that the error did not affect the outcome of the trial." *Id.* at 191. "In making this determination, a reviewing court should conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." *Id.* "When an appellate court undertakes a harmless error analysis its purpose is to ascertain the actual basis for the jury's verdict. . . , and [t]he crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision-making." *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008).

In the present case, the jury acquitted the defendant of the charged offense in count one and convicted him of felony reckless endangerment via the use of a deadly weapon. In count two, the jury convicted the defendant of reckless aggravated assault, which, as charged in the indictment, required that the jury also find that the defendant used a deadly weapon. *See* T.C.A. § 39-13-102(a)(2)(B). The jury rendered these findings despite the defendant's argument that the accident was caused by a speeding, intoxicated motorcyclist. Also, we note that the jury declined to reduce either count one or count two to simple assault, a lesser offense that was also charged to the jury in both counts. Under

these circumstances, we do not believe that the jury would have progressed to misdemeanor reckless endangerment which includes no requirement of the use of a deadly weapon.

This observation suggests that noticing the error is not necessary to do substantial justice for purposes of plain error review. *Smith*, 24 S.W.3d at 282. A finding of plain error is further negated because we cannot conclude that the defendant did not decline to request the instruction on the misdemeanor offense for tactical reasons. *See id.* In a charge conference held just prior to the defense resting, the trial judge stated his intention of instructing the jury on felony reckless endangerment and misdemeanor assault as lesser included offenses in both counts one and two. The defendant made no objection and did not request instructions on misdemeanor reckless endangerment. He had the opportunity to do so because the charge conference occurred before the defendant rested, the State put on its rebuttal proof, and counsel argued the case to the jury. Thus, on this record, the defendant has not shown that he did not eschew the instruction on misdemeanor reckless endangerment for tactical reasons.

Based upon these determinations, the trial court's error in omitting the instruction on misdemeanor reckless endangerment in count one is not plain and not a basis for reversal.

*2. Reckless Aggravated Assault*

Reckless aggravated assault, as charged in count two of the indictment, is committed by one who recklessly commits an assault by causing bodily injury and uses or displays a deadly weapon. T.C.A. § 39-13-102(a)(2)(B); 39-13-101(a)(1). The trial court instructed the jury that felony reckless endangerment was a lesser included offense. The jury convicted the defendant, however, of the charged offense.

Upon applying part (a) of the *Burns* test as we did in the preceding subsection, we conclude that both felony and misdemeanor reckless endangerment are lesser included offenses of reckless aggravated assault in this case because the use of a deadly weapon, as alleged in count two, imports conduct that "places or may place another person in imminent danger of death or serious bodily injury." Also, both offenses rely upon recklessness as the requisite mens rea. In keeping with our analysis in the preceding subsection, the failure to instruct on this *Burns* (a) lesser included offense was error.

On count two, however, we may be more expedient in determining that the omission of the instruction was harmless beyond a reasonable doubt and was not plain error. Because the jury eschewed felony reckless endangerment, an instructed offense that was between the conviction offense and misdemeanor reckless endangerment, the omission of an

instruction on the latter is harmless beyond a reasonable doubt. *Allen*, 69 S.W.3d at 189 ("The error may be harmless when the jury, by finding the defendant guilty of the highest offense to the exclusion of the immediately lesser offense, necessarily rejected all other lesser-included offenses.") (citing *State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998)). As we concluded in our review of count one, the indication of harmlessness of the error suggests the absence of plain error, and in any event, the defendant's failure to request the instruction on the misdemeanor offense despite knowing that the trial court intended to instruct on felony reckless endangerment precludes us from finding that the omission was not the result of a tactical choice. *See Page*, 184 S.W.3d at 231 ("The defendant has failed to show that he did not waive this issue for tactical reasons. Therefore, the trial court's failure to instruct on facilitation of second degree murder does not rise to the level of plain error."). We hold, therefore, that the trial court's failure to instruct on misdemeanor reckless endangerment in count two was not plain error.

## *VI. Duplicity*

The defendant next contends that the trial court should have dismissed the charge of leaving the scene of an accident because the wording of that charge in the indictment "effectively resulted in a duplicitous indictment" and "affected his substantial rights by authorizing a conviction for a nonexistent offense." The State asserts that the indictment "was not duplicitous and provided the necessary notice to the defendant."

At the June 13, 2008 motions hearing, the defendant asked the trial court to dismiss what was then count 5 of the indictment based on the following language within the charge: "did unlawfully, knowingly fail to stop and return to the scene of an accident upon a highway in Sevier County, Tennessee, after the defendant had been the driver of a motor vehicle which had been the driver of a motor vehicle." The State acknowledged the typographical error and asked for leave to amend the indictment. The trial court granted the request. On the first day of trial, the defendant filed a written motion again seeking dismissal of that count on the basis that the State had failed to remove the offending language and on the basis of the following language: "the defendant kn[e]w or should have known that injury resulted from the accident." The defendant claimed that this language charged a non-existent offense. The trial court permitted the State to amend the indictment and denied the defendant's motion.

Tennessee Code Annotated section 55-10-101(a) provides:

The driver of any vehicle involved in an accident resulting in injury to or death of any person shall immediately stop the vehicle at the scene of the accident or as close to the scene as

possible, but shall then return to and in every event shall remain at the scene of the accident until the driver has fulfilled the requirements of § 55-10-103. The stop shall be made without obstructing traffic more than is necessary. The requirements in this subsection (a) apply to accidents occurring upon highways and the premises of any shopping center, trailer park or any apartment house complex, or any other premises that are generally frequented by the public at large.

T.C.A. § 55-10-101(a). A violation of subsection (a) is class A misdemeanor unless the driver "knew or should reasonably have known that death resulted from the accident." *Id.* § 55-10-101(b)(1).

Although the indictment in this case apparently conflates the misdemeanor and felony versions of the offense, we cannot say that it is duplicitous because it does not charge two separate and distinct offenses within the same count. *See generally State v. Jefferson*, 529 S.W.2d 674, 678 (Tenn. 1975) (stating that an indictment charging more than one offense in a single count is duplicitous). In addition, the indictment in this case achieves "the overriding purpose of notice to the accused" because it contains a correct statutory reference. *See State v. Hammonds*, 30 S.W.3d 294, 300 (Tenn. 2000). Moreover, the trial court correctly instructed the jury, and the jury is presumed to follow the instructions of the court. *See State v. Kiser*, 284 S.W.3d 227, 272 (Tenn. 2009).

## *VII. Sentencing*

In his final claim, the defendant asserts that the trial court erred by sentencing him as a Range II, multiple offender because his previous convictions of aggravated assault and aggravated burglary involved offenses committed during the same 24-hour period. The State argues that because the defendant's aggravated burglary conviction was predicated upon his entering a habitation to commit the assault, both the aggravated assault and aggravated burglary convictions involved serious bodily injury and were thus excluded from the 24-hour merger rule. We agree with the defendant.

When considering challenges to the length and manner of service of a sentence this court conducts a de novo review with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d) (2006). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The appealing party, in this case the defendant, bears the burden of establishing impropriety in the sentence. T.C.A. § 40-35-401, Sentencing Comm'n

Comments; *see also Ashby*, 823 S.W.2d at 169. If our review of the sentence establishes that the trial court gave "due consideration and proper weight to the factors and principles which are relevant to sentencing under the Act, and that the trial court's findings of fact . . . are adequately supported in the record, then we may not disturb the sentence even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

> In making its sentencing decision, the trial court must consider:
>
> (1) The evidence, if any, received at the trial and the sentencing hearing;
> (2) The presentence report;
> (3) The principles of sentencing and arguments as to sentencing alternatives;
> (4) The nature and characteristics of the criminal conduct involved;
> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
> (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
> (7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The trial court should also consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5).

> Tennessee Code Annotated section 40-35-106, as it applies to the present case, provided:
>
> (a) A "multiple offender" is a defendant who has received:
>
> (1) A minimum of two (2) but not more than four (4) prior felony convictions within the conviction class, a higher class, or within the next two (2) lower felony classes, where applicable; or

(2) One (1) Class A prior felony conviction if the defendant's conviction offense is a Class A or B felony.

(b) In determining the number of prior convictions a defendant has received:

(1) "Prior conviction" means a conviction for an offense occurring prior to the commission of the offense for which the defendant is being sentenced;

(2) All prior felony convictions, including those occurring prior to November 1, 1989, are included;

. . . .

(4) Except for convictions for which the statutory elements include serious bodily injury, bodily injury, threatened serious bodily injury, or threatened bodily injury to the victim or victims, convictions for multiple felonies committed within the same twenty-four-hour period constitute one (1) conviction for the purpose of determining prior convictions . . . .

(c) A defendant who is found by the court beyond a reasonable doubt to be a multiple offender shall receive a sentence within Range II.

(d) The finding that a defendant is or is not a multiple offender is appealable by either party.

T.C.A. § 40-35-106 (2006).[5]

The propriety of the defendant's classification as a multiple offender depends upon his previous convictions for aggravated burglary and aggravated assault being considered separate offenses. *See State v. Horton*, 880 S.W.2d 732, 736 Tenn. Crim. App. 1994). At the sentencing hearing, the State argued that because the aggravated burglary indictment "clearly shows that he entered with the intent to commit an assault," the crime necessarily threatened bodily injury. Examining the statutory elements of the offense of

_____

[5]Effective August 17, 2009, the legislature amended Code section 40-35-106 to specifically exempt from the 24-hour rule convictions of aggravated burglary.

aggravated burglary, as is required by the statute, however, we disagree. Aggravated burglary is simply a "burglary of a habitation." T.C.A. § 39-14-403(a). Code section 39-14-403 is codified in the chapter covering property offenses. The statutory elements of the crime do not require a showing that bodily injury was either consummated or threatened. Certainly bodily injury is not threatened when the intended victim is not present. Accordingly, the "statutory element" analysis mandated by section 40-35-106(b)(4) indicates that the aggravated burglary conviction does not equate to an exception to the 24-hour rule.

As such, the defendant should have been classified as a standard, Range I offender for the felony convictions of reckless aggravated assault and fourth offense DUI. The case is remanded for resentencing on these counts.

*Conclusion*

Because we discern no error in the evidentiary rulings of the trial court, no error in the jury instructions, and no deficiency in the evidence supporting the defendant's convictions, the convictions are affirmed. Because, however, the trial court erred by classifying the defendant as a Range II, multiple offender, the case must be remanded to the trial court for resentencing on the felony convictions of reckless aggravated assault and fourth offense DUI.

_____
JAMES CURWOOD WITT, JR., JUDGE