**STATE of Tennessee**

v.

**Thomas Martin McGOUEY.**

Supreme Court of Tennessee,
at Knoxville.

May 1, 2007 Session.

June 29, 2007.

Mark E. Stephens, District Public Defender, Knoxville, Tennessee; J. Steven House, Madison, Wisconsin, for the appellant, Thomas Martin McGouey.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael E. Moore, Solicitor General; Randall Nichols, District Attorney General; Lewis Walton, Assistant District Attorney General (at trial); John H. Bledsoe, Assistant Attorney General (on appeal), for the appellee, State of Tennessee.

## OPINION

WILLIAM M. BARKER, C.J., delivered the opinion of the court, in which JANICE M. HOLDER, CORNELIA A. CLARK, and GARY R. WADE, JJ., joined.

The defendant, Thomas Martin McGouey, was convicted of aggravated assault and felony reckless endangerment, the aggravating factor of each being the use and display of a deadly weapon-an unloaded pellet gun. We granted permission to appeal in this case to determine whether the Court of Criminal Appeals erred in holding that a jury may conclude that an unloaded pellet gun constitutes a "deadly weapon" under Tennessee Code Annotated section 39–11–106(a)(5) (2003). We hold that the pellet gun is not a deadly weapon under subsection (a)(5)(A) because it is not a firearm, nor is it a deadly weapon under (a)(5)(B) because there is no evidence in the record that the defendant

used or intended to use the unloaded pellet gun in a manner capable of causing bodily injury or death. Because the defendant does not challenge the evidence supporting the lesser-included charges of simple assault or reckless endangerment, we enter convictions on those lesser charges and remand the case to the trial court for resentencing.

## Factual Background

Shortly before 1:00 a.m. on September 16, 2003, a call went out to the officers of the Knox County Sheriff's Office stating that there was a man at the Woodlands West Apartment Complex who was armed with a weapon, threatening to harm himself and/or others, and who had actually been firing the weapon. Several officers, including Mark Kennedy, Darryl Hamilton, Grayson Fritts, Benjamin Hibbert, and Clifford Russell, answered the call. The officers met at an Exxon station that was near the apartment complex to plan their course of action for dealing with the suspect. Officer Lee Strzelecki joined the other officers once they proceeded to the apartment complex.

As soon as the six officers arrived at the entrance to the complex, they saw a person matching the description of the suspect which had been transmitted by radio; he was standing in the center of a large field just to the right of the entrance. The lighting was dim, with no direct light on the field. The only light was provided by the nearby interstate highway and the apartments. It was clear enough, however, that the officers could see the defendant in the field and match his description to that given to them over the radio.

The defendant was standing with his hands behind his back. The officers exited their vehicles, drew their weapons, and began to approach the defendant. They formed a half-circle directly facing the defendant with Officer Kennedy in the middle. The officers ordered the defendant to show his hands and to drop whatever was behind his back. The defendant was about thirty to thirty-five yards away from Officer Kennedy. Suddenly, the defendant dropped his hands and brought his right hand forward, pointing an apparent weapon at Officer Kennedy. All the officers believed that the weapon was a black, semiautomatic pistol. The officers opened fire on the defendant until one shot struck the defendant in the shoulder, causing him to fall.

When the officers slowly approached the defendant and saw that he was still alive, they called for medical assistance. After one of the other officers secured the defendant's weapon, Officer Strzelecki handcuffed the defendant, removed his t-shirt, and began administering first-aid to the gunshot wound in the defendant's upper right shoulder, which was bleeding profusely. The defendant kept repeating, "Let me die" and "I'm sorry." Officer Strzelecki noticed that the defendant had a bull's eye drawn on his bare skin with the words "let me die" written on his rib cage.

Officer Michael Grissom and Police Chief Sexton had been out of town at a conference when the incident occurred but returned as soon as they received the call about a shooting involving officers. They drove directly to the apartment complex, where they investigated the defendant's apartment with the permission of the defendant's girlfriend.

The officers noticed two envelopes and a spiral bound notebook containing writing and a diagram of the area where the incident had occurred, along with the signature "Tommy" and the date "9–15–03." The diagram outlined a scenario where the defendant was the intended target in a "killing zone." At the bottom of the diagram were the words, "Can't have police

call Connie. She will let them know don't have a real gun." It said beside that: "Pick up some fire crackers to alert others thinking you do have a real gun. I'm sorry, Cory. I loved your mom." It also contained the notation "No one else gets hurt." Finally, the envelopes contained a note to the defendant's employer, a note to his girlfriend, and his request to be cremated.

Crime scene officers Brad Park and Angela Myers collected the evidence from the crime scene, took measurements and photographs, and made a videotape record of the scene. The weapon that had been in the defendant's possession was a "Daisy Power Line, Model 500, CO2, .177 caliber pellet pistol." The weapon did not have any pellets in it when collected, nor did it have a carbon dioxide cartridge, which would be necessary for the propulsion of pellets. While Officer Myers did not actually fire the weapon, she determined that it was functional.

Officer Kennedy testified that when he was confronted by the defendant, he was afraid that the defendant would shoot him or one of the other officers. He described feeling "stressed" and "scared." Officers Hamilton, Fritts, Strzelecki, Hibbert and Russell likewise testified that they were scared, thinking that the defendant was going to injure or kill one or more of them.

The defendant was indicted for the offense of aggravated assault against Officer Kennedy and for felony reckless endangerment. At the conclusion of his trial, the jury found the defendant guilty of aggravated assault and felony reckless endangerment. The trial court sentenced him as a Range I standard offender to concurrent sentences of three years and one year, respectively. The court ordered the defendant to serve his sentences in split confinement, giving him credit for time served. The Court of Criminal Appeals affirmed the convictions and sentences.

The defendant appeals, asking that the convictions for aggravated assault and felony reckless endangerment be stricken and convictions entered for the lesser-included offenses of simple assault and misdemeanor reckless endangerment.

## Analysis

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. *State v. Carruthers,* 35 S.W.3d 516, 558 (Tenn. 2000). The credibility of the witnesses, the weight given their testimony, and the reconciliation of conflicts in the proof are matters entrusted exclusively to the jury as the trier of fact. *State v. Bland,* 958 S.W.2d 651, 659 (Tenn.1997). In a criminal action, a conviction may be set aside for insufficient evidence only when the reviewing court finds that the "evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R.App. P. 13(e).

The defendant argues that the evidence is insufficient to support his convictions for aggravated assault and felony reckless endangerment because the use and/or display of a "deadly weapon" is an essential element of both charges and that the Court of Criminal Appeals erred in holding that the unloaded pellet gun is a deadly weapon within the meaning of Tennessee Code Annotated section 39–11–106(a)(5)(B) (referred to herein as "subsection B").

The State counters that the Court of Criminal Appeals properly held that the unloaded pellet gun qualifies as a deadly weapon within the statutory definition because an object is a deadly weapon under subsection B if the object has the capability to cause death or serious injury either

through its actual use in a particular situation or the use intended by its manufacturer regardless of its actual use in the particular case.

The statute provides that "[a] person commits assault who ... [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury...." Tenn. Code Ann. § 39–13–101(a) (2003). The assault is aggravated when accompanied by either "serious bodily injury" or the use or display of "a deadly weapon." Tenn.Code Ann. § 39–13–102(a)(1) (2003). Additionally, "[a] person commits an offense who recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury." Tenn.Code Ann. § 39–13–103(a) (2003). The offense of reckless endangerment becomes a felony when "committed with a deadly weapon." Tenn.Code Ann. § 39–13–103(b) (2003).

The indictment alleges that both the assault and the reckless endangerment were aggravated due to the use and display of a deadly weapon. Tennessee Code Annotated section 39–11–106(a)(5) (2003) defines "deadly weapon" as follows:

"Deadly weapon" means:

(A) A firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or

(B) Anything that in the manner of its use or intended use is capable of causing death or serious bodily injury....

The issue, therefore, is whether the unloaded pellet gun, as used in this case, is a deadly weapon within the meaning of Tennessee Code Annotated section 39–11–106(a)(5).

Provisions of the criminal code should be "construed according to the fair import of their terms, including reference to judicial decisions and common law interpretations, to promote justice, and effect the objectives of the criminal code." Tenn. Code Ann. § 39–11–104 (2003). The role of this Court in construing statutes "is to give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn.2000) (citing *State v. Butler*, 980 S.W.2d 359, 362 (Tenn.1998)). The construction of statutes and application of the law to the facts of a case are questions of law. *State v. Benham*, 113 S.W.3d 702, 704 (Tenn.2003). As such, the appellate standard of review is de novo without any presumption of correctness given to the lower courts' conclusions of law. *State v. Jennings*, 130 S.W.3d 43, 45 (Tenn.2004).

In *Morgan v. State*, 220 Tenn. 247, 415 S.W.2d 879 (Tenn.1967), we characterized deadly weapons as falling into one of two categories: weapons that are "deadly per se, such as fire arms; and deadly by reason of the manner in which they are used." *Id.* at 882. The concept of a "deadly weapon per se" is codified in Tennessee Code Annotated section 39–11–106(a)(5)(A) (2003) (referred to herein as "subsection A"), which includes any "firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury." Likewise, the second category for weapons that are "deadly by reason of the manner in which they are used," parallels subsection B, which includes "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury...."

A carbon dioxide powered pellet gun is not a deadly weapon per se because it is not a "firearm," which is defined as "any weapon designed, made or adapted to expel a projectile by the action of an explosive or any device readily convertible to that use." *See* Tenn.Code Ann. § 39–11–

106(a)(11) (2003).[1] Furthermore, there was no evidence that a pellet gun is designed or made for the purpose of inflicting death or serious bodily injury.[2]

The intermediate appellate court held that the "CO2 powered pellet gun is a deadly weapon within the definition of Tennessee Code Annotated section 39–11–106(a)(5)(B) because it is capable of causing death or serious bodily injury *when operated as intended.*" We respectfully disagree.

■ Subsection B specifically states that a deadly weapon is "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." In *Morgan,* we noted that it was generally understood that " 'a dangerous or deadly weapon is any weapon or instrument which, from the manner in which *it is used or attempted to be used,* is likely to produce death or cause great bodily injury.' " *Morgan,* 415 S.W.2d at 882 (quoting 77 C.J.S. *Robbery* § 25, p. 465) (emphasis added). If an item is not a deadly weapon per se, it will only be considered a deadly weapon under subsection B *if the defendant in a particular case actually used or intended to use* the item to cause death or serious bodily injury. *See Flemming,* 19 S.W.3d at 197.

In *Morgan,* we held that "a car tool, knife or other hard object wrapped in a sock and used as a bludgeon or club to assault a person" was a deadly weapon within the meaning of the robbery statute. 415 S.W.2d at 882. Since then, many common items have been held to qualify as deadly weapons, but only if the defendant in the particular case used or intended to use the item in a manner that is capable of causing death or serious bodily injury. *See, e.g., State v. Madden,* 99 S.W.3d 127, 137 (Tenn.Crim.App.2002) (pointed-toe cowboy boots used to kick person lying on ground were deadly weapons); *State v. Eaves,* 959 S.W.2d 601, 604 (Tenn.Crim. App.1997) (hard plastic pen used to stab a person was a deadly weapon); *State v. Tate,* 912 S.W.2d 785, 787–88 (Tenn.Crim. App.1995) (automobile used to run into person was a deadly weapon).

In these cases, when analyzing whether a particular object is a deadly weapon under subsection B, this Court has looked not at how the object was designed to be used, but rather at how the object was used in the particular case. To do otherwise would be to blur the distinction between the definitions found in subsection A and subsection B.

In *Flemming,* the intermediate appellate court held that the statutory definition of "deadly weapon" was not so broad as to encompass fists and feet. 19 S.W.3d at 197. On appeal to this Court, the State argued this conclusion is contrary to *Morgan,* as well as the plain meaning of the statute. *Id.* We explained that in *Morgan* we had characterized weapons as either deadly per se or "deadly by reason of the manner in which they are used," and then concluded that "[t]his characterization, however, does not suggest that a defen-

---

1. An "explosive" is generally defined as being a chemical-type substance such as dynamite, nitroglycerine, or gunpowder, and does not include a simple air or a carbon dioxide cartridge. *See The Random House Dictionary of the English Language* 681, 682 (2d ed.1987) (defining "explode" and "explosive"); *see also* 31A Am.Jur.2d *Explosions and Explosives* § 2 (2002) (defining an explosive as "a substance or combination of substances which, upon rapid decomposition or combustion, cause an explosion." Such substances include gunpowder and gasoline if accompanied by a wick).

2. The parties both agree in their briefs that the unloaded pellet gun does not satisfy the first definition of "deadly weapon" as set forth in subsection A.

dant's body parts could be considered deadly weapons.... *Morgan* merely recognizes that some instruments or objects, though not traditionally considered deadly weapons, may become deadly weapons by the manner in which they are used." *Id.*

In this case, having determined that the unloaded pellet gun was not a deadly weapon per se, we must determine whether it became deadly by the manner in which the defendant used it. There is no evidence in the record to suggest that the defendant used or intended to use the unloaded pellet gun in a manner capable of causing bodily injury or death to the officers. Therefore, the pellet gun, as used by the defendant in this case, is not a deadly weapon under the definition found in subsection B. *See Morgan*, 415 S.W.2d at 882.[3]

### Conclusion

In sum, a deadly weapon is either deadly per se or deadly by reason of the manner in which it is used. If an item is not a deadly weapon per se, it will only be considered a deadly weapon if the defendant in a particular case actually used or intended to use the item to cause death or serious bodily injury. We hold that the unloaded pellet gun was not a deadly weapon as used in this case because there was no evidence that the defendant used or intended to use the pellet gun in manner that could cause death or serious bodily injury. Accordingly, the evidence is insufficient to support the defendant's convictions for aggravated assault and felony reckless endangerment. Because the de-

fendant does not challenge the sufficiency of the evidence to support convictions for simple assault and misdemeanor reckless endangerment, we enter convictions on those lesser-included offenses and remand the case to the trial court for resentencing.

Costs of this appeal are taxed to the State of Tennessee, for which execution may issue, if necessary.

---

**3.** In so holding, we overrule *State v. Wampler*, No. 03C01–9608–CR–00325, 1997 WL 559433 (Tenn.Crim.App. Sept.9, 1997) (no perm. appeal filed), in which a different panel of the Court of Criminal Appeals held that an unloaded, yet functional, spring-loaded pellet gun qualifies as a deadly weapon. *Wampler* was decided prior to *Flemming*, which clari-

fied the idea that if an item is not a deadly weapon per se, it will only be considered a deadly weapon under section B if the defendant in a particular case actually used or intended to use the item to cause death or serious bodily injury. *See Flemming*, 19 S.W.3d at 197.