# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### March 27, 2012 Session

## STATE OF TENNESSEE v. BILLY J. BLANKENSHIP

**Appeal from the Criminal Court for Campbell County**
**No. 14337    E. Shayne Sexton, Judge**

---

**No. E2011-01550-CCA-R3-CD - Filed October 31, 2012**

---

A Campbell County jury convicted the Defendant-Appellant, Billy J. Blankenship, of robbery, a Class C felony, and theft of property valued at $1000 or more but less than $10,000, a Class D felony. He received a sentence of four years for robbery and three years for theft, to be served concurrently in the Department of Correction. On appeal, Blankenship argues that the evidence is insufficient to support the convictions because the State failed to prove the particular allegations of the indictments. Upon review, we reverse and vacate the judgment for robbery, and remand for a new trial as to the robbery offense. The judgment for theft, however, is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Reversed and Vacated in Part**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which, JOSEPH M. TIPTON, P.J., and THOMAS T. WOODALL, J., joined.

Michael G. Hatmaker and Brent Gray, Jacksboro, Tennessee for the Defendant-Appellant, Billy J. Blankenship.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Wm. Paul Phillips, District Attorney General; and Michael O. Ripley, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

**Background.** A grand jury indicted Blankenship with aggravated robbery and theft. The indictment stated:

COUNT 1

The Grand jurors for the State of Tennessee, duly elected, impaneled, sworn, and charged to inquire in and for the body of the County of Campbell, in the State of Tennessee, upon their oath, present: That

**Billy J. Blankenship**

prior to the finding of this indictment, on or about July 14, 2009, in the County and State aforesaid, did unlawfully, feloniously, intentionally, and knowingly and without the effective consent of the owner, obtain property, to wit: money, with the intent to deprive the owner thereof, from the person of Tabitha McNealy by violence and accomplished with a deadly weapon, or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon, to wit: a gun, in violation of T.C.A. § 39-13-402, all of which is against the peace and dignity of the State of Tennessee.

COUNT 2

And the Grand Jurors aforesaid, upon their oaths aforesaid, do further present: that **Billy J. Blankenship** prior to the finding of this indictment, on or about July 14, 2009, in the County and State aforesaid, did unlawfully, feloniously, and knowingly obtain or exercise control over property to wit: money, of a value of an amount more than $1000 but less than $10,000, the property of First Volunteer Bank, with the intent to deprive the owner thereof and without the owner's effective consent, in violation of T.C.A. § 39-14-103, all of which is against the peace and dignity of the State of Tennessee.

At trial, held on August 18, 2010, Beverly Lester testified that she was working as a teller at First Volunteer Bank in Jellico on July 14, 2009. At approximately 2:50 p.m., no customers were in the bank, and Ms. Lester was conversing with tellers Sheila Powers and Tabitha McNealy at McNealy's teller station. Ms. Lester noticed movement out of the corner of her eye, and when she looked up, she saw a man standing in front of her. The man had "reddish looking hair" and wore a black ball cap, black glasses, a black t-shirt, and a bandana over his face. With a gun in one hand, the man tossed a yellow bag on the counter and told Ms. McNealy, "Fill it up and don't push any buttons." Ms. McNealy complied and began to fill the bag with money from the drawer at her teller station. Meanwhile, the man paced nervously and looked at the tellers. Ms. Lester said the man "had the gun up but then he would bring it down and point it at us and then he would raise his hand back up." Once Ms. McNealy filled the bag, the man grabbed it and fled.

Ms. Lester estimated that the robbery lasted less than five minutes. During that time, she was "scared to death" and believed she "was gonna die" because the man was "waving the gun around and pointing it at [her]." She later viewed a security camera recording of the events and identified the man who robbed the bank as Blankenship. Still-frame photographs taken from the recording showing the robber were admitted as an exhibit at trial.

On cross-examination, Ms. Lester testified that the bank and not Ms. McNealy owned the money that the robber took.

Sheila Powers testified that she was working as a teller at First Volunteer Bank in Jellico on the date in question. Her account of the robbery was substantially similar to Ms. Lester's. She was "terrified" during the robbery, which she estimated lasted "maybe a minute." She could not identify the robber. On cross-examination, she testified that the bank owned the money that the tellers kept in their drawers and that Ms. McNealy did not give the robber any of her own money.

Tabitha McNealy, who was also working at the bank as a teller at the time of the robbery, offered substantially similar testimony as Ms. Lester and Ms. Powers. She testified that she removed more than $8,000 from the drawer beside her at her teller station and placed it in the bag the robber gave her. She did not recognize the robber. On cross-examination, Ms. McNealy testified that the robber took money that belonged to the bank and that she did not own the money that he took. On redirect, she testified that she was responsible for the money in the drawer and that it was given to her "in [her] keep and [her] care."

Special Agent Paul Hughes of the Federal Bureau of Investigation testified that he participated in the investigation of the robbery of First Volunteer Bank in Jellico. He and other law enforcement officers went to Blankenship's house on the evening of the robbery, where they talked with Blankenship's wife. While the officers were at the house, Blankenship drove by. The officers stopped him, and Special Agent Hughes, along with other officers, later interviewed him. Blankenship admitted robbing the bank. He said he did so because he was in "dire financial [straits]." Blankenship explained that he had been unemployed, leaving the burden of paying his family's bills on his wife. Before the robbery, Blankenship and his wife argued about their financial situation, and his wife told him he needed to provide for the family. Blankenship then went to the bank. He put on a hat with a wig inside it and took into the bank a yellow bag and an "air soft pistol" which he had painted black. Special Agent Hughes described the pistol: "It's a type of . . . an air pistol. It shoots out little tiny plastic pellets. And the ones I've seen, they are built in a way that they represent a real firearm. They look exactly like a real firearm." Inside the bank, Blankenship approached the teller and ordered her to put money in the bag and not to push any buttons. He left the bank with the bag full of money. Blankenship said he then went home and gave

his wife about $1250, telling her it was payment earned from a job he lied about having. He gave $100 to a family member to whom Blankenship owed a debt, kept $100 for himself, and hid the remainder under a utility shed close to a nearby gas well. Blankenship also told Special Agent Hughes that he threw the disguise and pistol off a bridge into water as he drove away from the bank. Officers attempted to find the hidden money and the discarded items, but they were unable to do so.

Special Agent Hughes testified that Blankenship's wife gave officers a "bank robbery demand note" that she found in the house. Blankenship explained to Special Agent Hughes that he had written the note and gave it to a friend as a joke. He took the note back from the friend and put it inside a book in his house.

On cross-examination, Special Agent Hughes acknowledged that Blankenship was cooperative with officers. He agreed that the pistol was a "toy gun" and that Blankenship took money that belonged to the bank rather than Ms. McNealy.

Special Agent Buddy Early of the Federal Bureau of Investigation testified that he was present for the interview of Blankenship. Special Agent Early described Blankenship's statement consistently with Special Agent Hughes's testimony. He additionally testified that Blankenship said he chose First Volunteer Bank as the target of the robbery because he had previously been a customer there and was familiar with the bank. Blankenship said that he had planned to use the handwritten note to rob the bank but that he changed his mind. The note, admitted as an exhibit, read, "Real quietly and quickly put all the money in the bag and no one gets hurt. ALL THE MONEY!!" On cross-examination, Special Agent Early described an "air soft pistol" as "a functioning toy gun that . . . shoot[s]" plastic pellets. He said, "[T]hey're not made for children. A lot of adults use these in games . . . . It's not a real gun. I don't know if I would describe it as a toy."

Assistant Chief J.J. Hatmaker of the Jellico Police Department testified that he worked as a detective in July of 2009 and that he assisted in the investigation of this case. He went to Blankenship's residence in Kentucky, located less than three miles from First Volunteer Bank in Jellico. There, he recovered $1180 in cash from Blankenship's wife. Photographs of the cash were admitted into evidence as exhibits.

Assistant Chief Hatmaker was present for Blankenship's statement to Special Agents Hughes and Early. Hatmaker also interviewed Blankenship later on the same day, and Blankenship provided a written statement which was admitted into evidence as an exhibit. The statement was identical in all substantive respects to the statement Special Agents Hughes and Early described in their testimony.

-4-

In the course of the investigation, Blankenship consented to the search of his vehicle, in which officers found two additional handwritten notes. Each consisted of a list. The first included a list of items: ski masks, dark clothes, gloves, ammunition, firearms, and fishing poles. Also written on the note were, "planned [e]xit," "No talkin' No prints," and "@ 7:30-8:00 A.M." According to Hatmaker, written on the second note were the phrases "road block, tree, rocks, etc.," "hiding place for my truck," "position for myself," and "game plan for after the job." Both notes were admitted as exhibits at trial.[1]

Assistant Chief Hatmaker testified that he went to the bank and retrieved video recordings from the bank's security cameras. A number of still-frame photographs from the recordings depicting the robbery were admitted as exhibits at trial.

On cross-examination, Hatmaker testified that soon after the robbery, he went to the bank. He learned that only the bank's money, which he said was under Ms. McNealy's control at the time, had been taken and that none of Ms. McNealy's belongings were taken.

Michael Johnson, the branch manager of First Volunteer Bank in Jellico at the time of the robbery, testified that he reviewed the bank's security camera recordings after the robbery, and he gave copies of the recordings to Assistant Chief Hatmaker. Mr. Johnson described the tellers' duties regarding the bank's money. He said that each teller had an assigned station with a drawer in which the teller kept money. The money in the drawer belonged to the bank, but the teller was responsible for it. The teller was "required to keep count of all of [the money] and . . . [she] balance[d] every day to make sure that all money [wa]s accounted for." On the date of the robbery, Mr. Johnson did not give Blankenship or anyone else permission to take $8,000 from the bank.

Christy Rigney, a financial service representative at the bank, testified that she was in her office across from Ms. McNealy's teller station at the time of the robbery. She noticed a man wearing a wig and a hat order Ms. McNealy to put money in a bag. The man pointed a gun at the tellers and "kind of started waving it around." The tellers looked "very terrified," and Ms. Rigney was "really scared." She estimated that the robbery lasted two minutes. At the time of the robbery, Ms. Rigney recognized Blankenship, whom she knew because she had attended school with him and had assisted him at the bank several times when he was a customer.

Blankenship offered no proof in defense. Following trial, the jury convicted him of robbery and theft of property valued at $1000 or more but less than $10,000. This timely appeal followed.

---

[1]The second note was not included in the record on appeal.

**ANALYSIS**

Blankenship argues that the evidence is insufficient to support his convictions because the State failed to prove the allegations in the indictment. Specifically, he asserts that "the verdict of guilty is contrary to the weight of the evidence [that the stolen money] was never identified as belonging to the named victim in the indictment." The State responds that Blankenship has waived any challenge to the indictment by failing to raise it before trial. Additionally, the State contends that the evidence is sufficient to support the convictions. We conclude that although the evidence is legally sufficient to sustain the robbery conviction, the trial court committed plain error pursuant to State v. Adkisson, 899 S.W.2d 626 (Tenn. Crim. App. 1994), by charging the jury that it could convict Blankenship of robbery if it found that the offense was committed by placing the victim in fear or by violence. We also conclude that the evidence is sufficient to support the theft conviction.

When a defendant challenges the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). The standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).

This court, when reviewing issues regarding the sufficiency of the evidence, shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). The Tennessee Supreme Court has stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659 (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973)). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden

of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

Blankenship's claim regarding the sufficiency of the evidence relates to a variance between the allegations of the indictment and the proof at trial. This doctrine arises from a defendant's constitutional right to be informed of "the nature and cause of the accusation." U.S. Const. amend. VI, XIV; Tenn. Const. art. I, § 9. Tennessee Code Annotated section 40-13-202 provides:

> The indictment must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in a manner so as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment.

T.C.A. § 40-13-202 (2006). The Tennessee Supreme Court has held that an indictment is valid if it contains sufficient information "(1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997) (citations omitted). "[S]pecific reference to a statute within the indictment may be sufficient to place the accused on notice of the charged offense." State v. Sledge, 15 S.W.3d 93, 95 (Tenn. 2000) (citing State v. Carter, 988 S.W.2d 145, 149 (Tenn. 1999); Ruff v. State, 978 S.W.2d 95 (Tenn. 1998)). However, an indictment need not allege a specific theory of liability in order to give proper notice to the accused. State v. Lemacks, 996 S.W.2d 166, 172 (Tenn. 1999); see also T.C.A. § 40-13-206(a) ("When the offense may be committed by different forms, by different means or with different intents, such forms, means or intents may be alleged in the same count in the alternative.").

"[A] defendant cannot legally be convicted of an offense which is not charged in the indictment or which is not a lesser offense embraced in the indictment." State v. Cleveland, 959 S.W.2d 548, 552 (Tenn. 1997). This court has held that there must be continuity between the indictment and the evidence presented at trial in order for a conviction to stand:

> Having the right to be informed of the criminal charge that he or she is to meet at trial, the accused cannot be tried for or convicted of an offense not charged in the indictment or information. Put simply, not only must the government prove the crime it charges, it must charge the crime it proves.

State v. Goodson, 77 S.W.3d 240, 244 (Tenn. Crim. App. 2001) (citing 41 Am. Jur. 2d Indictments and Informations § 258 (1995); Cleveland, 959 S.W.2d at 552) (emphasis

added). However, the indictment may be amended with the defendant's consent. Tenn. R. Crim. P. 7(b)(1). In order for an indictment to be amended pursuant to Rule 7(b), "an oral or written motion to amend the indictment should be made, and the defendant's oral or written consent to the motion must be clear from the record." State v. Stokes, 24 S.W.3d 303, 304 (Tenn. 2000). Even without the defendant's consent, a trial court may allow an indictment to be amended before jeopardy attaches "if no additional or different offense is charged and no substantial right of the defendant is prejudiced." Tenn. R. Crim. P. 7(b)(2). However, "after an indictment has been returned, its charge may not be broadened or changed except by action of the grand jury." Goodson, 77 S.W.3d at 244 (citing U.S. Const. amend. V; Tenn. Const. art. I, § 14; United States v. Miller, 471 U.S. 130, 148 (1985); Stirone v. United States, 361 U.S. 212, 215 (1960)). In Goodson, this court observed the difference between constructive amendments and variances between the indictment and the evidence:

> "[C]ourts [must] distinguish between constructive amendments of the indictment, which are reversible per se, and variances between indictment and proof, which are evaluated under the harmless error doctrine. The accepted test is that a constructive amendment of the indictment occurs when the jury is permitted to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged. . . . In such cases, reversal is automatic, because the defendant may have been convicted on a ground not charged in the indictment. . . . If, on the other hand, the variation between proof and indictment does not effectively modify an essential element of the offense charged, the trial court's refusal to restrict the jury charge to the words of the indictment is merely another of the flaws in trial that mar its perfection but do not prejudice the defendant."

Id. (quoting U.S. v. Adams, 778 F.2d 1117, 1123 (5th Cir. 1985) (internal citations omitted)).

Here, Blankenship asserts that the indictment identified Ms. McNealy as the owner of the money he took during the robbery. The proof, according to Blankenship, established First Volunteer Bank, not Ms. McNealy, as the owner, thereby leading to a variance that voids his conviction for robbery. We disagree.

Initially, we note that the State's argument that Blankenship waived any issues related to the indictment because he failed to raise them prior to trial is misplaced. Although generally a defendant must raise defects in the indictment prior to trial, see Tenn. R. Crim. P. 12(b)(2)(B), (f)(1), the general rule does not apply to a constructive amendment. The problem arising from a constructive amendment is that the defendant lacks notice of the crime the State later proves at trial. Because the defendant cannot discover the defect before

trial, a finding of waiver based on a failure to raise the issue before trial would be inappropriate.

The language of the indictment for aggravated robbery states that Blankenship, "without the effective consent of the owner, obtain[ed] property, to wit: money, with the intent to deprive the owner thereof, from the person of Tabitha McNealy." Contrary to Blankenship's argument, the indictment does not name Ms. McNealy as the owner of the money. Instead, it alleges that Blankenship took an unnamed owner's property from Ms. McNealy. No variance resulted, therefore, between the indictment and the trial proof in this regard. Furthermore, even had the indictment identified Ms. McNealy as the owner, no variance problems would result. "Owner" is statutorily defined to mean "a person, other than the defendant, who has possession of or any interest other than a mortgage, deed of trust or security interest in property, even though that possession or interest is unlawful and without whose consent the defendant has no authority to exert control over the property." T.C.A. § 39-11-106(a)(26) (2009). The proof established that Ms. McNealy was such an owner. Cf. Watson v. State, 341 S.W.2d 728, 729-30 (Tenn. 1960) (finding no variance when the indictment alleged that a store clerk in possession of money at the time of robbery was the owner and the trial proof demonstrated the store clerk possessed the money as the store owner's agent or bailee); State v. Maxwell, 669 S.W.2d 100, 101 (Tenn. Crim. App. 1984) (finding no variance when the indictment alleged that a motel clerk on duty at time of robbery was the owner of stolen money and the trial proof demonstrated that the motel owned the money); Harrell v. State, 593 S.W.2d 664, 669 (Tenn. Crim. App. 1979) (finding no variance when the indictment alleged that the defendant stole money from a supermarket cashier although the supermarket owner actually owned the money).

We also note that Blankenship is not entitled to relief on the ground that the evidence failed to establish that he committed the robbery by violence, as charged in the indictment. "Violence" in the context of robbery means "physical force unlawfully exercised so as to damage, injure or abuse." State v. Fitz, 19 S.W.3d 213, 217 (Tenn. 2000). "Pointing a deadly weapon at the victim is physical force directed toward the body of the victim," and therefore constitutes violence. State v. Allen, 69 S.W.3d 181, 186 (Tenn. 2002). We acknowledge the Tennessee Supreme Court's ruling that a carbon dioxide-powered pellet gun is not a deadly weapon per se. See State v. McGouey, 229 S.W.3d 668, 672-74 (Tenn. 2007); id. at 674 n.3 (expressly overruling State v. Wampler, NO. 03C01-9608-CR-00325, 1997 WL 559433 (Tenn. Crim. App., at Knoxville, Sept. 9, 1997), which held that a spring-loaded pellet gun is a deadly weapon). However, as we will explain, the evidence in this case is legally sufficient to support the conviction for robbery by violence.

All four of the eyewitnesses, the three bank tellers and the financial services representative, testified that Blankenship had a gun. Photographs from the incident revealed

nothing to indicate that the gun in Blankenship's hand was anything other than an actual firearm capable of shooting bullets. Blankenship was recognized and identified by eyewitnesses. We cannot conclude that the evidence is insufficient simply because the "firearm" used by Blankenship was allegedly a "toy gun."

In fact, the only evidence supporting a conclusion that the firearm was a toy gun is the statement given by Blankenship to law enforcement agents. Moreover, the firearm was never found where Blankenship claimed he disposed of it, and, for that matter, a substantial amount of money was also never found where Blankenship told FBI agents he had carefully hidden it. The jury was entitled to accept the portion of Blakenship's pretrial statement that it deemed credible and to reject the portion of the statement that it deemed false. State v. Gilbert, 612 S.W.2d 188, 190 (Tenn. Crim. App. 1980) (citing Batey v. State, 527 S.W.2d 148 (Tenn. Crim. App. 1975)). Moreover, the Tennessee Supreme Court stated:

> In confessions or statements of the kind voluntarily made by the accused the jury must take the whole of this statement or confession and weigh it as they weigh the other evidence, rejecting some part if they desire to do so and giving credit to other parts of the statement if they have a sufficient reason to do so under all the evidence as it is introduced.

Espitia v. State, 288 S.W.2d 731, 733 (Tenn. 1956). In Blankenship's case, the robbery had to be committed by violence because the State limited itself to this mode of committing the offense when it drafted the indictment to present to the Campbell County Grand Jury. See T.C.A. § 39-13-401. Pointing a deadly weapon, i.e., a handgun, at a robbery victim constitutes violence. State v. Allen, 69 S.W.3d 181, 186 (Tenn. 2002). Accordingly, we conclude that the evidence is sufficient to support the robbery conviction.

Despite the fact that the evidence is legally sufficient to sustain the robbery conviction, we conclude that the trial court committed plain error by charging the jury that it could convict Blankenship of robbery if it found that the offense was committed by placing the victim in fear or by violence. There was overwhelming proof presented at trial that Blankenship committed the offense by violence and by putting the victim in fear, and the State argued the "fear" mode of committing the robbery offense in its closing argument. In Adkisson, our court stated that in order for an error to be considered plain:

> (a) the record must clearly establish what occurred in the trial court;
>
> (b) a clear and unequivocal rule of law must have been breached;
>
> (c) a substantial right of the accused must have been adversely affected;

(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994).

The indicted offense of aggravated robbery, as relevant here, is a robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-402(a)(1) (2006). However, the conviction offense of robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. § 39-13-401. The robbery statute, therefore, provides two alternative modes of committing robbery. Here, the indictment specifically alleged only one of those two modes, that Blankenship committed the offense "by violence," thereby confining the State to prove the robbery by violence. See State v. Paul Richardson, No. W2008-02506-CCA-R3-CD, 2010 WL 3791973, at *9 (Tenn. Crim. App., at Jackson, Sept. 29, 2010) (holding that a constructive amendment voided a conviction for aggravated assault when the indictment alleged assault committed by bodily injury and the trial court instructed the jury on assault committed by reasonable fear of imminent bodily injury and extremely offensive or provocative contact), perm. app. denied (Tenn. Mar. 9, 2011); State v. Wayne E. Mitchell, No. 01-C-01-9209-CR-00295, 1993 WL 65844, at *3 (Tenn. Crim. App., at Nashville, March 11, 1993) (stating that "when a statute contains different ways to commit the offense it proscribes, the instruction given to the jury should be limited to the precise offense alleged in the charging instrument to the exclusion of the remaining theories"), perm. app. denied (Tenn. July 6, 1993).

As we previously noted, there was overwhelming proof presented at trial that Blankenship committed the offense by violence and by putting the victim in fear. Although the indictment alleged that Blankenship committed the robbery offense "by violence," the court charged the jury regarding both the "violence" and "fear" modes of robbery:

Any person who commits the offense of robbery is guilty of a crime. For you to find the defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements: Number one, that the defendant knowingly obtained or exercised control over property owned by another; and number two, that the defendant did not have the owner's effective consent; and number three, that the defendant intended to deprive the owner of the property; and number four, that the defendant took such property from the person of another by the use of violence or by putting the person in fear; and number five, that the defendant took such property

-11-

intentionally or knowingly.

The Tennessee Supreme Court has stated that when reviewing challenged jury instructions, we must look at "the charge as a whole in determining whether prejudicial error has been committed." In re Estate of Elam, 738 S.W.2d 169, 174 (Tenn. 1987) (citing Abbot v. American Honda Motor Co., 682 S.W.2d 206, 209 (Tenn. Ct. App. 1984)). We note that "[a]n instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Faulkner, 154 S.W.3d 48 (Tenn. 2005) (citing State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998)). Because the robbery jury instruction in this case failed to fairly submit the legal issues and misled the jury as to the applicable law, it is prejudicially erroneous. Consequently, we conclude that the trial court committed plain error pursuant to Adkisson, 899 S.W.2d at 641-42. Accordingly, the judgment of conviction for robbery is reversed and vacated, and the case is remanded for a new trial on the charge of robbery.

We now address Blankenship's assertion that the evidence is insufficient to support the conviction for theft of property valued at $1,000 or more but less than $10,000. "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103. Here, the evidence, viewed in the light most favorable to the State, proved that Blankenship decided to rob the First Volunteer Bank and deliberately planned the robbery, his disguise, and his "game plan for after the job." He took approximately $8,000 from the bank without anyone's consent. We conclude that such evidence was more than sufficient to support the conviction for theft.

Although not raised by Blankenship, we also conclude that the trial court should have merged the theft conviction with the robbery conviction because both convictions were based on the same facts. The indictment alleges that Tabitha McNealy was the victim of the robbery and that First Volunteer Bank was the victim of theft. See State v. Powell, No. E2009-01301-CCA-R3-CD, 2010 WL 2219620, at *6 (Tenn. Crim. App. June 2, 2010) (holding that "principles of double jeopardy bar the defendant's multiple convictions of robbery and theft" under the same facts and that "[t]he finding of guilty on the theft count should be merged into the judgment of conviction of robbery"), perm. app. denied (Tenn. Nov. 12, 2010). Although we have concluded that the judgment of conviction for robbery is reversed and vacated, we note that the dual convictions for theft and robbery in this case cannot stand. In the event that the reversal of the robbery judgment is overturned on appeal or if, upon re-trial Blankenship is convicted of robbery, the theft and robbery must be merged to prevent a double jeopardy violation.

**CONCLUSION**

-12-

Because the trial court committed plain error in its jury instruction regarding robbery, we reverse and vacate the judgment of conviction for robbery and remand the case for a new trial on the charge of robbery. In addition, we affirm the trial court's judgment for theft.

_____
CAMILLE R. McMULLEN, JUDGE