IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 22, 2015

**STATE OF TENNESSEE v. SHANNON DIXON**

**Appeal from the Circuit Court for Marion County**
**No. 9465     Thomas W. Graham, Judge**

---

**No. M2014-00718-CCA-R3-CD – Filed June 17, 2015**

---

The defendant, Shannon Dixon, was convicted by a Marion County Circuit Court jury of aggravated assault, a Class C felony, and was sentenced to five years, suspended to probation after service of twelve months of incarceration. On appeal, the defendant argues that the trial court erred in: (1) denying his request for a special jury instruction that a pellet gun was not a deadly weapon per se for purposes of the aggravated assault statute, and (2) not applying as a mitigating factor at sentencing that he acted under strong provocation. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROGER A. PAGE, JJ., joined.

Paul D. Cross, Monteagle, Tennessee, for the Appellant, Shannon Dixon.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; James Michael Taylor, District Attorney General; and David O. McGovern, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**FACTS**

This case involves a dispute between neighbors apparently arising out of the victims' dog injuring a dog belonging to the defendant. As a result, the defendant was charged with the aggravated assaults of Robert Joseph Riner and his son, Robert Earl

Riner. After the trial, the jury found the defendant not guilty of the aggravated assault of Robert Joseph Riner, but guilty of the aggravated assault of Robert Earl Riner.[1]

## State's Proof

At trial, Robert Joseph Riner[2] testified that he gained experience and knowledge about weapons when he served as a combat engineer and diesel mechanic in the military. Robert said that in November 2012, he and his family lived in a mobile home in Tracy City, Tennessee, and had two dogs for pets. One of the dogs, a pit bull named Belle, occasionally slipped out of her collar, in which case they brought her inside the house. Robert was personally not aware of Belle's causing any problems as a result of slipping out of her collar.

On the day of the incident, around 9:00-10:30 a.m., Robert's son, the victim, took Belle outside to relieve herself. The victim came back inside and informed Robert that the defendant was "outside on his porch shooting a gun over to our property trying to kill either [the dogs] or him." Robert quickly put on some clothes and ran outside toward the defendant's house, while Robert's wife went to look out a window on the front of the house to see what was going on. Robert said that he never made it out of his yard, and he was not armed. He elaborated that, although he owned three guns, they were stored at his cousin's home at that time because his children had been trying to play with them.

Robert testified that he ran toward the defendant's house, where the defendant was standing on his porch with a gun in his hands, screaming, "[I]f you ever shoot at my kid again, I will beat your brains out[.]" In response, the defendant "raised that gun up and pointed straight at [Robert], and . . . said, 'I'll kill you and that dog right now you son of a bitch.'" Robert held up his hands to show that he was unarmed and told the defendant to "hold up" and threatened to call the police. Robert turned around and told his wife to call 911. He then rounded up his children and dog and returned to the house. He said that he feared for his safety. Robert stated that he knows the difference between a long gun and a pistol, and he could tell "that day it was a rifle in [the defendant's] hand of some sort."

On cross-examination, Robert admitted that he did not hear any shots fired that day because of noise inside the house. Robert said that, when he ran outside, the victim was ten to fifteen feet from the fence line between his and the defendant's properties.

---

[1] In light of the verdict, we will refer to Robert Joseph Riner by name and Robert Earl Riner as "the victim."

[2] Because this witness and his wife share the same surname, we will refer to them by first name only at times for clarity. We mean no disrespect by this practice.

Robert estimated that the defendant was shooting from a distance of 110 to 120 yards. Robert recalled that a police officer arrived and talked to him and the defendant, but left without making an arrest. Two days later, Robert took out a warrant for the defendant's arrest, and he also retrieved his pistol from his cousin's house for protection.

Stacy Riner, the victim's mother and Robert's wife, testified that the defendant was her nephew. Stacy recalled that a few days before the incident in this case, their dog, Belle, attacked one of the defendant's puppies that had come over into their yard. On the day of the incident, Stacy and her husband were in their bedroom, when the victim entered and informed them that the defendant was shooting at Belle or in the direction of their home. The victim had been outside with Belle as she was trying to relieve herself and had been staying close by her to make sure she did not wander off. "[D]umb founded" as to why the defendant would be shooting, Stacy told the victim to take Belle back outside to relieve herself and that she and her husband would go outside to investigate.

Stacy testified that she looked out a window facing the defendant's property, from where she saw the defendant step back out on his porch, raise his gun, point, and fire. Stacy opened the window and demanded to know what he was thinking by firing his gun at her son. At that point, Stacy saw Robert come from behind the house and head toward the fence line. Robert also confronted the defendant as to why he was shooting at the victim. When Robert warned the defendant not to shoot at his son, the defendant stepped off his porch, pointed his gun straight at Robert, and said, "I'll kill you and the dog." Robert told the defendant, "[N]o, no, hold up, hold up," and asked Stacy to call 911. Robert herded the children back inside the house and got the phone.

On cross-examination, Stacy admitted that she told the victim that the defendant did not have a right to shoot onto their property or tell them that they had to chain the dogs, and then made the victim take the dog back outside to relieve herself. Stacy said that, from her vantage point at the window when she was looking outside, she saw the defendant fire one shot. The shot was aimed at the dog, but the victim was close by. Stacy said that her husband had no guns in their home or on the property at the time of the incident, but that he retrieved a gun from his cousin's house two days after the incident – the same day he took out a warrant on the defendant. She said that if she testified at the preliminary hearing that her husband possessed a gun that day, it was because she "may have got messed up or something."

The eleven-year-old victim testified that, on the day of the incident, he and Belle were outside walking a few feet from the fence line between his and the defendant's property. They stayed on their side of the fence. The victim saw the defendant standing on his front porch with a gun and start shooting. At first, the victim was not concerned,

3

thinking the defendant "was shooting like regular because he does it mainly every day." However, he became concerned when he "saw [the defendant] shoot the second firing and that's when I saw him aim right at me and my dog." The defendant's gun appeared to be a rifle, and he pointed it "[r]ight at [the victim] and [his] dog." The victim returned to the house and told his parents. His parents instructed him to go back outside and continue walking the dog, and they would get dressed and go find out why the defendant was firing his gun at the victim and the dog.

The victim testified that he went back outside with Belle, and he saw the defendant "step[] back out of his house and take[] the third shot." Almost immediately, the victim's mother opened the door and confronted the defendant, and the victim's father walked out the back door and yelled at the defendant as well. The victim's father walked toward the fence line, unarmed. The victim's father warned the defendant "that he was going to beat his brains out if he ever shot at [the victim] again." The defendant responded that "he would kill my dad and that dog right now," as he pointed the gun at the victim's father.

The victim recalled his testimony from the preliminary hearing. He said that if he testified that his father's pistol was in the closet in the house, he was mistaken because his parents had removed the guns from the house to prevent his younger siblings from playing with them. Asked if he thought the defendant's gun was a rifle or a pellet gun, the victim responded, "I'd say one of them pellets." Asked about the sound of the shot he heard the defendant fire, the victim said, "I've had a BB gun before and I've heard a pellet rifle . . . before and it sounded like a pellet rifle."

The parties stipulated that Officer Clifford Billingsley arrived at the scene and advised the defendant to stay away from the Riners and for the Riners to keep their dog in their yard. Officer Billingsley found no bullets or shell casings at the scene.

**Defendant's Proof**

The defendant testified that, the day before the incident in this case, the Riners' pit bull, Belle, attacked one of his puppies in the Riners' yard. The defendant and Stacy broke up the two dogs, but the defendant's puppy was hurt rather badly. The next day, the defendant's children were outside playing with their puppies on their property near the driveway when they alerted the defendant that Belle was running toward them. The defendant grabbed a steel bar and ran outside. He saw Robert and the victim yelling at Belle, and Belle returned to the Riners' property. The defendant told Robert that he needed to keep Belle on a leash, and Robert threatened to "beat [his] f'ing brains out" if the defendant harmed Belle. Stacy leaned out of a window and screamed at the defendant as well. The defendant claimed that Robert was armed with a small black pistol with a

4

white pearl handle as he approached the fence line between the two properties. Robert did not point the gun at the defendant but "did have the gun in his hand." The defendant said that he called the police.

The defendant testified that he called the police, but Robert and Stacy flagged the officer down when he arrived and talked to him first. The officer then spoke with the defendant, and the defendant showed him the steel bar that he had carried outside. The officer told the defendant that the bar could have easily been mistaken for a gun given the distance of more than 100 yards between the two residences. The defendant denied being armed with anything other than a steel bar.

The defendant admitted that he did not get along with Robert but denied intending to harm any of the Riners or their dog. He described the victim as a "[g]ood kid" but untruthful.

### Rebuttal Proof

Tammy Reed, Robert Riner's cousin, testified that at the time of the incident in this case, Robert's guns were stored at her house. She recalled that she stored one pistol and two "big guns" for him, and Robert retrieved the pistol a couple of days after the incident. At the time of trial, she still had Robert's two big guns in her possession.

### ANALYSIS

### I. Jury Instruction

The defendant argues that trial court erred in denying his request for a special jury instruction that a pellet gun was not a deadly weapon per se for purposes of the aggravated assault statute.

The record shows that the defendant requested that the following instruction be given to the jury:

> A BB-gun or a carbon dioxide powered pellet gun is not a deadly weapon per se because it is not a firearm, and there was no evidence that a pellet gun was designed or made for the purpose of inflicting death or serious bodily injury.

The trial court denied the defendant's request because there was a dispute in the proof about whether the defendant used or displayed a gun. Specifically, the court stated:

5

I don't think there's enough proof in the record for us even to begin to use that particular charge. I think that the more general charge. The jury's got to determine first of all beyond a reasonable doubt, was there a weapon there, at all. I mean the jury has to first know whether there's a weapon there at all.

The trial court then charged the jury regarding a deadly weapon as follows:

Deadly weapon means a firearm or anything manifestly designed, or made or adapted for the use of inflicting death or serious bodily injury or anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.

In support of his argument that the trial court erred in failing to charge the jury that a pellet gun is not a deadly weapon per se, the defendant relies on State v. McGouey, 229 S.W.3d 668 (Tenn. 2007), a case in which our supreme court held that the evidence was insufficient to support the defendant's conviction for aggravated assault by use or display of a deadly weapon because the unloaded pellet gun was not a deadly weapon per se, nor was there evidence that the defendant intended to use it in a manner capable of causing death or serious bodily injury. Id. at 669. The McGouey court elaborated:

In Morgan v. State, 220 Tenn. 247, 415 S.W.2d 879 (Tenn. 1967), we characterized deadly weapons as falling into one of two categories: weapons that are "deadly per se, such as fire arms; and deadly by reason of the manner in which they are used." Id. at 882. The concept of a "deadly weapon per se" is codified in Tennessee Code Annotated section 39-11-106(a)(5)(A) (2003) . . . which includes any "firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury." Likewise, the second category for weapons that are "deadly by reason of the manner in which they are used," . . . which includes "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury. . . ."

A carbon dioxide powered pellet gun is not a deadly weapon per se because it is not a "firearm," which is defined as "any weapon designed, made or adapted to expel a projectile by the action of an explosive or any device readily convertible to that use." See Tenn. Code Ann. § 39-11-106(a)(11) (2003). Furthermore, there was no evidence that a pellet gun is designed or made for the purpose of inflicting death or serious bodily injury.

6

. . . .

In this case, having determined that unloaded pellet gun was not a deadly weapon per se, we must determine whether it became deadly by the manner in which the defendant used it. There is no evidence in the record to suggest that the defendant used or intended to use the unloaded pellet gun in a manner capable of causing bodily injury or death to the officers. Therefore, the pellet gun, as used by the defendant in this case, is not a deadly weapon[.]

McGouey, 229 S.W.3d at 672-74 (footnotes omitted).

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001) (citing State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). An instruction will be considered prejudicially erroneous only if it fails to submit the legal issues fairly or misleads the jury as to the applicable law. State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005) (citing State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998)). A trial court's denial of a request for special jury instructions is error only when the trial court's charge does not fully and fairly state the applicable law. State v. Cozart, 54 S.W.3d 242, 245 (Tenn. 2001).

In McGouey, there was no dispute that the defendant was armed with an unloaded pellet gun that also did not contain the carbon dioxide cartridge necessary for the propulsion of pellets. 229 S.W.3d at 671. It was agreed that the pellet gun at issue in McGouey was not a firearm, or designed or made for the purpose of inflicting death or serious bodily injury. Id. at 673 n.3. Thus, the issue in McGouey was whether the unloaded pellet gun was a deadly weapon by reason of the manner in which it was used. Id. at 673-74.

However, in this case, as noted by the trial court, there was a dispute in the proof as to what the defendant was armed with: some testimony indicated he was armed with a metal bar, some testimony indicated that he was armed with a firearm – a rifle, and some testimony indicated that he was armed with a pellet gun. Thus, from the proof, the jury could determine that the defendant was not armed with a deadly weapon at all, armed with a deadly weapon per se, or armed with what could be considered a deadly weapon by its use or intended use. Therefore, because of the dispute in the proof and that the jury

7

must first determine whether the defendant used or displayed a deadly weapon at all, the trial court properly denied the defendant's request for a special jury instruction on a pellet gun not being a deadly weapon per se.

## II. Sentencing

The defendant argues that the trial court erred in not applying as a mitigating factor at sentencing that he acted under strong provocation.

Under the 2005 amendments to the sentencing act, a trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

8

In sentencing the defendant, the trial court enhanced the defendant's sentence upon finding that the defendant had a previous history of criminal convictions or criminal behavior in addition to that necessary to establish the appropriate range and that he failed to comply with the conditions of a sentence involving release into the community on at least five occasions. See Tenn. Code Ann. § 40-35-114(1), (8). Specifically, the court found:

> I don't think there's any question that the record reflects both criminal behavior and criminal conduct or convictions that have occurred quite a few in a relatively short period of time. I think something like . . . five probation revocations; and a reckless endangerment which is involved in this issue where the folks thought he was shooting at them; . . . in addition to that two previous simple assault convictions and a failure to appear and two simple possession of marijuana convictions; and also to some extent as far as criminal conduct, the order of protection is based on assaultive behavior, so there is a substantial period of criminal behavior and criminal convictions that would be an enhancing factor in this case. . . .

> . . . [H]e certainly has a record of failing to comply with conditions of a sentence involving release in the community, because of the probation violation, so there's a bunch of those, so that's another enhancing factor.

The defendant does not dispute the trial court's application of the two enhancement factors but instead contends that the court abused its discretion by rejecting his argument that he acted under strong provocation. See Tenn. Code Ann. § 40-35-113(2). However, the record shows that the trial court considered the factor but gave it very little weight. In this regard, the court found:

> I don't see any mitigators. The provocation factor doesn't ring true to me because everything, I mean, the people were in their yard and they thought they had been threatened by the defendant. Ultimately found that they were threatened by the defendant. Seems to me . . . that they're within their rights. You couldn't classify that as a provocation, you know. So if it had any . . . provocating factors at all, very limited effect in weighing that against [the defendant's] criminal record and in weighing it against the failure to comply with release into the community, they far outweigh any possibility of a mitigator on provocation.

Moreover, the defendant's reliance on State v. Steven Shane Neblett, No. M2011-02360-CCA-R3-CD, 2012 WL 4841322 (Tenn. Crim. App. Oct. 9, 2012), perm. app. denied (Tenn. Jan. 22, 2013), yields him no relief. In Steven Shane Neblett, this court

determined that the jury's verdict, which rejected the defendant's claim of self-defense, negated the application as a mitigating factor that the defendant acted under strong provocation. Id. at *14. Positing the reverse of the logic in Neblett, the defendant asserts that, had the jury thought that Robert Joseph Riner had been truly threatened or endangered by him, it would have found him guilty in the count of aggravated assault against Riner. However, the opposite could be said in that, by finding the defendant guilty in the count of aggravated assault against the victim, the jury rejected the defendant's argument that he acted under strong provocation.

In sum, the record reflects that the trial court imposed the sentence after proper consideration of all the evidence and testimony, the purposes and principles of our sentencing act, and consideration of the enhancement and mitigating factors. See Bise, 380 S.W.3d at 706. In light of the presumption of correctness attendant to the trial court's findings, we discern no abuse of discretion in the trial court's imposition of a term of five years.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE

10